# EXHIBIT C

## SECURITIES TRANSFER AND ASSIGNMENT AGREEMENT

SECURITIES TRANSFER AND ASSIGNMENT AGREEMENT, dated as of June 27, 2006, by and between Omicron Master Trust (the "Seller") and Portside Growth and Opportunity Fund (the "Purchaser", and together with the Seller, the "Parties").

W I T N E S S E T H:

WHEREAS, the Purchaser desires to purchase from the Seller and the Seller desires to sell to the Purchaser the securities more particularly listed on Schedule 1 hereto issued to the Seller by the respective issuers identified on Schedule 1 hereto (each a "Company" and collectively, the "Companies") on the respective dates shown on Schedule 1 hereto (collectively, the "Securities"); and

WHEREAS, in connection with the purchase and sale of the Securities, the Seller shall purchase from the Purchaser, and the Purchaser shall sell to the Seller, certain shares of common stock and certain call options, and the Purchaser shall purchase from the Seller, and the Seller shall sell to the Purchaser, certain put options, all as set forth on Schedule 4 hereto and as provided herein;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and intending to be legally bound, the Parties hereto agree as follows:

**ARTICLE I**

**Purchase and Sale of the Securities**

Section 1.1. *Purchase and Sale of the Securities.*

(a)    Upon the terms and subject to the conditions of this Agreement and on the basis of the representations, warranties and agreements contained herein, the Seller hereby agrees, effective immediately upon execution and delivery of this Agreement by the Parties on the date hereof and the receipt of the Purchase Price (as defined herein) as provided in Section 1.1(b) (the "Effective Time") (i) to sell, assign, transfer and convey to the Purchaser the Securities, (ii) to purchase from the Purchaser the number of shares of common stock set forth on Schedule 4 hereto equal to the Seller's short positions associated with such Securities for which Purchaser also has obtained borrow (collectively, the "Short Securities") and certain call options as set forth on Schedule 4 hereto (the "Call Options") and (iii) to sell, assign, transfer and convey to the Purchaser certain put options as set forth on Schedule 4 hereto (the "Put Options") and the Purchaser hereby agrees to purchase the Securities from the Seller, to sell the Short Securities and the Call Options to the Seller and to purchase the Put Options from the Seller at the Effective Time. The aggregate purchase price for the Securities shall be ███████ (the "Purchase Price"). In addition, the Seller shall pay the Purchaser for the Short Securities purchased hereunder in accordance with Section 1.1(h) below.

(b)    The Purchaser shall pay the Purchase Price by wire transfer of

immediately available funds as follows:

(i) 25% of the Purchase Price, less the aggregate amount of the Purchase Price being paid through the executing broker for the Unrestricted Securities (as defined below), shall be paid by the Purchaser to the Seller immediately after execution of this Agreement by the Parties on the date hereof.

(ii) 75% of the Purchase Price shall be paid by the Purchaser by deposit of funds (the "Escrow Deposit") with Law Offices of Brian W Pusch, as Escrow Agent (the "Escrow Agent"), pursuant to the Escrow Agreement in the form attached as Exhibit A (the "Escrow Agreement").

(c) The Escrow Deposit shall be released to the Seller in accordance with the Escrow Agreement as follows:

(i) one-third of the Escrow Deposit shall be released by the Escrow Agent to the Seller on such date as the Purchaser shall have received (by delivery by mail, by hand or by courier service or by telephone line facsimile transmission or by e-mail transmission) Notices and Acknowledgements of Transfer of Securities substantially in the form attached hereto as Exhibit B (each, a "Notice and Acknowledgment") executed by the Seller and Companies which Notices and Acknowledgements relate to Securities with an aggregate Parity Value, based on the amounts set forth on Schedule 1 hereto (the "Parity Value"), of more than 50% of the Aggregate Parity Value set forth on Schedule 1 (the "Aggregate Parity Value").

(ii) one-third of the Escrow Deposit shall be released by the Escrow Agent to the Seller on such date as the Purchaser shall have received Notices and Acknowledgments executed by the Seller and Companies which Notices and Acknowledgements relate to Securities with an aggregate Parity Value of more than 75% of the Aggregate Parity Value.

(iii) one-third of the Escrow Deposit shall be released by the Escrow Agent to the Seller on such date as the Purchaser shall have received Notices and Acknowledgments executed by the Seller and Companies which Notices and Acknowledgements relate to Securities with an aggregate Parity Value of more than 95% of the Aggregate Parity Value.

(d) The Purchaser and the Seller agree to use their respective reasonable best efforts to cause each Company to execute and deliver to the Seller and the Purchaser a Notice and Acknowledgement for the Securities such Company issued, to issue the relevant certificates or instruments for the Securities in the name of the Purchaser, and to reflect the Purchaser as the registered owner of such Securities on such Company's records relating to ownership of such Securities.

(e) The foregoing procedure for a Company to execute a Notice or Acknowledgment shall not apply to the Securities not subject to any restriction on transfer, whether pursuant to any transaction document, securities laws or otherwise as set forth on Schedule 3 hereto (collectively, the "Unrestricted

64.24.04.01                                                                                                     2

Securities").

(f) The Parties agree that at and from the Effective Time:

(i) as between the Seller and the Purchaser, the Purchaser shall be deemed from the close of business on June 19, 2006 (the "Determination Date") to be the owner of the Securities for all purposes and the economic benefit of the Securities, including accrued interest and dividends as of June 16, 2006 (as per Schedule 1) and the right to payment or distribution of any interest, dividend, securities or other assets which the registered holder of such Securities is entitled to receive and for which the record date is on or after the Determination Date (collectively, the "Distributions") shall accrue to the benefit of the Purchaser;

(ii) the Seller shall (A) hold in trust for the benefit of the Purchaser any Distributions the Seller receives and promptly after receipt transfer and pay over or deliver to the Purchaser such Distributions and (B) send to the Purchaser at its address provided in Section 6.1, promptly after receipt by the Seller, any notices or other communications from a particular Company relating to the Securities of such Company which notices or communications the Seller receives prior to the date that is 14 days after such Company shall have registered such Securities in the name of the Purchaser or its nominee.

(g) The Purchaser and the Seller each reserves the right to waive any of the requirements for its benefit set forth in this Agreement.

(h) The Seller shall pay the purchase price for the Short Securities through the executing broker based on the trade prices reported by the executing broker.

(i) If the requirements for release from escrow in Sections 1.1(c)(i) and 1.1(c)(ii) have been satisfied but, notwithstanding the reasonable best efforts of the Seller and the Purchaser, the requirements for release from escrow set forth in Section 1.1 (c)(iii) have not been satisfied and it appears to the Seller that such requirements might not be readily satisfied, then upon notice by the Seller to the Purchaser, the Parties shall in good faith seek to reach agreement on the portion of the amount referred to in Section 1.1(c)(iii) to be released from escrow under the Escrow Agreement, based on the Notices and Acknowledgments received by the Purchaser in addition to those necessary to satisfy the requirements of Sections 1.1 (c)(i) and 1.1(c)(ii) (the "Specified Notices and Acknowledgements"). The Parties shall jointly instruct the Escrow Agent to release the amount so agreed by the Parties. If 21 or more days following such notice from the Seller, the Parties have not agreed on the amount to be so released, then the Seller may request that the matter be submitted to a qualified appraiser, selected by the Seller and acceptable to the Purchaser. Such appraiser shall be instructed to determine the fair market value as of the Determination Date of the Securities for which the Purchaser has received Specified Notices and Acknowledgements in proportion to the sum of (1) the fair market value as of the Determination Date of the Securities for which the Purchaser shall have received Specified Notices and Acknowledgements *plus* (2) the fair market value as of the Determination Date of the Securities for which the

Purchaser has not yet received Notices and Acknowledgements. The amount to be released from escrow shall be the sum of (1) $3,062,350.00 *plus* (2) the product of (x) the proportion so determined by such appraiser *times* (y) $15,311,750.00. Within five business days after such determination by the appraiser, the Parties shall instruct the Escrow Agent to release from escrow under the Escrow Agreement the amount so computed.

Section 1.2 *Assignment of Rights and Obligations*. The Seller hereby agrees that at the Effective Time, without further act by the Seller or the Purchaser, the Seller shall irrevocably assign, transfer and convey to the Purchaser all of the Seller's right, title and interest in and to the Securities, including, without limitation, all rights and obligations of the holder of the Securities under the agreements and instruments relating to the securities to which the Seller is a party or which are registered in the Seller's name and that are identified on Schedule 1 hereto (collectively, the "Transaction Documents"). The Purchaser hereby agrees that at the Effective Time, without further act by the Purchaser or the Seller, the Purchaser shall accept the assignment, transfer and conveyance thereof, shall assume all of the Seller's obligations under the Transaction Documents to the extent such obligations relate to the Securities and shall thereafter be bound by the provisions thereof applicable to it as owner of the Securities or as party to the Transaction Documents, as the case may be, and that thereafter the Seller shall have no further obligations under the Transaction Documents to the extent such obligations relate to the Securities.

Section 1.3 *Methods of Transfer*. (a) The Seller shall transfer the Securities that are Unrestricted Securities and that are publicly traded through transactions on the date of the Effective Time through an executing broker on the stock exchanges or other public markets on which such Securities are listed or quoted for trading. In case the actual price at which any such Security set forth in Schedule 3 is so transferred (determined without regard to brokerage commission) is (x) higher than the closing price of securities of such class or series on such exchange or market on the Determination Date (the "Calculation Price"), then the Seller shall be obligated to make a payment to the Purchaser equal to the product of the amount of such excess times the number of such Securities so transferred or (y) less than the Calculation Price for such Securities, then the Purchaser shall be obligated to make a payment to the Seller equal to the product of the amount of such deficiency times the number of such Securities so transferred. The Parties shall compute the amount of all such payment, determine the net amount and the Party obligated to pay such net amount shall make payment thereof within three trading days after the date of the Effective Time by wire transfer of immediately available funds to such account as shall be specified by the receiving party.

(b) The Seller and the Purchaser shall use their respective reasonable best efforts to cause the transfer to the Purchaser, as soon as practicable after the Effective Time, of the Securities that are not Unrestricted Securities (the "Restricted Securities") or which are not listed or traded on a stock exchange or other public market, including, without limitation, that (x) the Seller shall deliver, as soon as practicable after the Effective Time, to each Company that issued such Securities (1) the certificates or instruments evidencing such Securities, (2) such

stock or bond powers as may be necessary for such transfer, (3) the legal opinion of the Law Offices of Brian W Pusch, addressed to each Company that issued such Securities being transferred in accordance with this Section 1.3(b), substantially in the form attached as Exhibit C and (4) a Notice and Acknowledgement addressed to such Company and (y) the Purchaser shall provide to each Company that requests the same such confirmation of the Purchaser's representations, warranties, covenants and agreement herein as such Company may request and such other information, representations, warranties, covenants and agreements as such Company may reasonably request.

(c) The Purchaser shall transfer to the Seller the Short Securities through transactions on the date of the Effective Time through an executing broker on the stock exchanges or other public markets on which such Short Securities are listed or quoted for trading. In case the actual price at which any such Short Security set forth in Schedule 4 is so transferred (determined without regard to brokerage commission) is (x) higher than the closing price of securities of such class or series on such exchange or market on the Determination Date (the "Short Calculation Price"), then the Purchaser shall be obligated to make a payment to the Seller equal to the product of the amount of such excess times the number of such Securities so transferred or (y) less than the Short Calculation Price for such Short Securities, then the Seller shall be obligated to make a payment to the Purchaser equal to the product of the amount of such deficiency times the number of such Short Securities so transferred. The Parties shall compute the amount of all such payment, determine the net amount and the Party obligated to pay such net amount shall make payment thereof within three trading days after the date of the Effective Time by wire transfer of immediately available funds to such account as shall be specified by the receiving party.

1.4. *Agreement Binding.* This Agreement shall become binding on the Parties when executed and delivered by both Parties.

## ARTICLE II

### Representations and Warranties of the Seller

The Seller hereby represents and warrants to the Purchaser as follows:

Section 2.1. *Authorization.* It is not and has never been an "affiliate", as defined in Rule 405 under the Securities Act of 1933, as amended (the "1933 Act"), of any Company. It has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder, all of which have been duly authorized by all requisite action on its part. This Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding obligation, enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. The execution, delivery and performance by the Seller of this Agreement and the transactions contemplated hereby, including, without

limitation, the sale of the Securities by the Seller (i) do not and will not violate the organizational documents of the Seller, (ii) do not violate, conflict with, constitute a default (or an event which with notice or lapse of time or both would become a default) or result in any breach or contravention of, or the creation of any lien under, any contractual obligation of the Seller, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which Seller is a party, (iii) assuming the accuracy of the Purchaser's representations and warranties in this Agreement and the accuracy of the representations and warranties of each Company in the Transaction documents to which it is a party or which it issued, violate any provision of any federal or state statute, rule or regulation which is, to the Seller's knowledge, applicable to the Seller and (iv) do not violate any judgment, injunction, writ, award, decree or order of any nature (collectively, "Orders") against, or binding upon, the Seller.

Section 2.2.  *No Consents.*  No notice to, filing with, or authorization, registration, consent or approval of any governmental authority or other individual, partnership, corporation, joint stock company, unincorporated organization or association, trust or joint venture, or a governmental agency or political subdivision thereof (each, a "Person") is necessary for the execution, delivery or performance of this Agreement or the consummation of the transactions contemplated hereby by it except as may be set forth in the Transaction Documents.

Section 2.3.  *Ownership of the Securities.*  It solely owns the Securities beneficially and of record, and at the time of sale and transfer to the Purchaser will transfer title free and clear of any liens, claims or encumbrances other than the same arising from or through the Purchaser or arising under applicable securities laws or set forth in the applicable Transaction Documents (collectively, "Encumbrances").  It has not entered into any agreement, arrangement or other understanding (i) granting any option, warrant or right of first refusal with respect to the Securities to any Person, (ii) except as set forth in the Transaction Documents, restricting its right to sell the Securities to the Purchaser, or (iii) except as set forth in the Transaction Documents, restricting any other of its rights with respect to the Securities.  It has the absolute and unrestricted right, power and capacity to sell, assign and transfer the Securities to the Purchaser free and clear of any Encumbrances.  Subject to payment of the Purchase Price as set forth in Section 1.1(b) of this Agreement and release of the Escrow Deposit from escrow in accordance with Section 1.1(c) of this Agreement and in accordance with the Escrow Agreement, upon transfer into the Purchaser's name by each Company of the Securities issued by such Company, the Purchaser will acquire good, valid and marketable title to such Securities, free and clear of any Encumbrances.

Section 2.4.  *No Brokers and No Solicitation.*  No Person is or will be entitled to a broker's, finder's, investment banker's, financial adviser's or similar fee from it in connection with this Agreement or any of the transactions contemplated hereby, except for brokerage commissions that the Seller and the Purchaser will incur in connection with the purchase of Unrestricted Securities as provided in Section 1.3(a), which commissions on the sale side of such transactions shall be paid by the Seller.  Since the time the Seller acquired each Restricted Security, neither the

Seller nor any person acting on behalf of the Seller has offered or sold such Restricted Security by any form of general solicitation or general advertising.

Section 2.5. *Transfer Restriction*. The Securities to be delivered are not and will not be as of the Effective Time, subject to any Transfer Restriction, other than the restriction that the Restricted Securities and the common stock underlying any Restricted Securities have not been registered under the 1933 Act and, therefore, cannot be resold unless it is registered under the Securities Act or in a transaction exempt from or not subject to the registration requirements of the Securities Act (the "Permitted Securities Law Restriction") and other than restrictions set forth in the Transaction Documents. For the purposes of this section, "Transfer Restriction" means, with respect to any Security, any condition to or restriction on the ability of the holder thereof to sell, assign or otherwise transfer such Security or other, whether set forth in such security or in any document related thereto or arising by operation of law, including, without limitation, such conditions or restrictions arising under federal, state or foreign securities laws or under contract.

Section 2.6. *Seller*. The Seller (i) is a sophisticated person with respect to the sale of the Securities; (ii) has adequate information concerning the business and financial condition of the Companies to make an informed decision regarding the sale of the Securities; and (c) has independently and without reliance upon the Purchaser, and based on such information as the Seller has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that the Seller has relied upon the Purchaser's express representations, warranties and covenants in this Agreement. The Seller acknowledges that the Purchaser has not given the Seller any investment advice, credit information or opinion on whether the sale of the Securities is prudent.

Section 2.7 *Absence of Litigation*. No proceedings relating to the Securities are pending or, to the knowledge of the Seller, threatened before any court, arbitrator or administrative or governmental body that would adversely affect the Seller's right to transfer the Securities to the Purchaser.

Section 2.8. *Information*. The Seller is unaware of and has not provided the Purchaser with any material, nonpublic information regarding any Company, including, its businesses, projections or results of operations.

Section 2.9. *Concerning the Schedules*. The information set forth on the Schedules hereto is complete and accurate in all material respects and the Seller acknowledges that the Purchase Price is based on the accuracy in all material respects of the amounts and information set forth on such Schedules.

# ARTICLE III

## Representations and Warranties of the Purchaser

The Purchaser hereby represents and warrants to the Seller as follows:

Section 3.1. *Authorization*. It has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder, all of which have been duly authorized by all requisite action on its part. This Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding agreement, enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

Section 3.2. *Access to Information*. It has received all information regarding the Company that it deems necessary or advisable to evaluate the risks and merits of an investment in the Securities. It acknowledges that neither the Seller nor any of its authorized representatives have made any representation or warranty regarding any Company or an investment in the Securities, other than as contained herein. The Purchaser has made its own investigation and assessment of the businesses of the Companies and the merits and risks of purchasing the Securities in making the Purchaser's determination to purchase the Securities. The Purchaser understands that its investment in the Securities involves a significant degree of risk.

Section 3.3. *Brokers*. No person is or will be entitled to a broker's, finder's, investment banker's, financial adviser's or similar fee from it in connection with this Agreement or any of the transactions contemplated hereby, except for brokerage commissions that the Seller and the Purchaser will incur in connection with the Purchaser's purchase of Unrestricted Securities as provided in Section 1.3(a), which commissions on the purchase side of such transactions shall be paid by the Purchaser.

Section 3.4. *Financial Resources*. It has presently available to it sufficient cash resources to enable it to pay the Purchase Price.

Section 3.5 *Restricted Securities*. The Purchaser understands and acknowledges that the Restricted Securities have not been registered under the 1933 Act or the securities laws of any state of the United States. The Purchaser further understands that any of the Restricted Securities (including the shares of common stock of the Companies that are issuable upon conversion or exercise of any of the Restricted Securities that include the right to convert into, exchange for or otherwise acquire common stock) will be subject to the restrictions on transfer and certificate legending requirements described in the respective Transaction Documents.

Section 3.6 *Accredited Investor*. The Purchaser represents that it is an "Accredited Investor" as defined in Regulation D under the 1933 Act. The Purchaser is acquiring the Restricted Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the 1933 Act or any applicable state securities law, has no present intention of distributing any of such Restricted Securities in violation of the 1933 Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution

of the Restricted Securities in violation of the 1933 Act or any applicable state securities law; *provided, however,* that nothing herein shall limit the Purchaser's right to sell the Restricted Securities or any underlying shares of common stock pursuant to a registration statement or exemption or otherwise in compliance with applicable federal and state securities laws. The Purchaser is acquiring the Restricted Securities hereunder in the ordinary course of its business. The Purchaser is not required to be registered as a broker-dealer under Section 15 of the Securities Exchange Act of 1934, as amended.

Section 3.7 *Reliance on Exemptions.* The Purchaser understands that the Restricted Securities are being offered and sold to it in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that Seller is relying upon the truth and accuracy of, and the Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of the Purchaser to acquire the Restricted Securities. The Purchaser is not purchasing the Restricted Securities as a result of any general advertisement, article, notice or other communication regarding the Restricted Securities published in any newspaper, magazine or similar media or broadcast over television, radio or a "webcast" over the Internet, or presented at any seminar or any other general solicitation or general advertisement.

Section 3.8. *Purchaser.* The Purchaser (i) is a sophisticated person with respect to the purchase of the Securities; (ii) has adequate information concerning the business and financial condition of the Companies to make an informed decision regarding the purchase of the Securities; and (c) has independently and without reliance upon the Seller, and based on such information as the Purchaser has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that the Purchaser has relied upon the Seller's express representations, warranties and covenants in this Agreement. The Purchaser acknowledges that the Seller has not given the Purchaser any investment advice, credit information or opinion on whether the purchase of the Securities is prudent.

Section 3.9 *Absence of Litigation.* No proceedings relating to the Securities are pending or, to the knowledge of the Purchaser, threatened before any court, arbitrator or administrative or governmental body that would adversely affect the Purchaser's right to acquire the Securities from the Seller.

Section 3.10 *Information.* The Purchaser is unaware of and has not provided the Seller with any material, nonpublic information regarding any Company, including, its businesses, projections or results of operations.

Section 3.11 *Concerning the Transaction Documents and Schedules.* The Purchaser has reviewed the Transaction Documents in the forms thereof that are publicly available through the Securities and Exchange Commission or as provided to the Purchaser by the Seller and the Schedules to this Agreement and to the best of the Purchaser's knowledge the information and amounts set forth on the Schedules hereto is complete and correct.

## ARTICLE IV

### Certain Covenants

Section 4.1. *Certain Non-Assignable Rights.* (a) In case of any right of first refusal, right of participation, right to make additional investments or to purchase additional securities, or similar right that the Seller may have with respect to any Company and which rights arise under the Transaction Documents, other than any such rights arising under warrants to purchase securities which the Seller owns and which are outstanding on the date of this Agreement and are not included in the Securities, and which rights, by their terms, may not be assigned by the Seller (collectively, the "Additional Rights"), the Seller will use its commercially reasonable best efforts after the Effective Time to exercise such rights, at the direction, and at the sole cost and expense, of the Purchaser from time to time to the extent permitted by the Transaction Documents and applicable law, and the Seller shall sell, assign, transfer and convey to the Purchaser from time to time all of the Seller's right, title and interest in and to any and all securities issued to the Seller upon exercise of any Additional Rights. The Purchaser shall accept all such assignments, transfers and conveyances of such securities and any agreements or other instruments relating thereto and upon each such assignment, transfer and conveyance shall become a party to and bound by such agreements and instruments and the Seller shall have no further obligations thereunder.

(b) In order to permit the Purchaser to have an opportunity to instruct the Seller as to exercise of any Additional Rights, the Seller shall use commercially reasonable best efforts to notify the Purchaser promptly after the Seller receives notice from a Company of the opportunity to exercise particular Additional Rights. The Purchaser shall determine whether or not it wishes the Seller to exercise particular Additional Rights for the benefit of the Purchaser, and the Purchaser shall notify the Seller of such determination, promptly after receipt of such notice from the Seller. If the Purchaser shall determine that it wishes the Seller to exercise particular Additional Rights for the Purchaser's benefit, then the Purchaser shall be responsible for making payment to the particular Company of the amount required to so exercise such Additional Rights. In no event shall the Seller be liable for the failure to timely or properly exercise any Additional Right unless such failure results primarily from the Seller's bad faith or willful refusal to act in accordance herewith. To the extent the Seller is not obligated hereunder to exercise particular Additional Rights for the benefit of the Purchaser, the Seller may exercise such Additional Rights for itself or for the benefit of another person.

Section 4.2. *Seller's Warrant Portfolio.* If the Seller determines to offer any part of its portfolio of warrants for sale through a competitive bid or auction procedure prior to December 31, 2006, the Seller shall offer the Purchaser an opportunity to bid on such part of the portfolio. The Seller shall be under no obligation to accept the Purchaser's bid.

# ARTICLE V

## Survival, Amendment and Waiver

Section 5.1. *Survival*. The representations and warranties contained in this Agreement or any certificate delivered in connection herewith shall survive the sale of the Securities as contemplated hereby.

Section 5.2. *Amendments*. This Agreement (including the provisions of this Section 4.2) may not be amended or modified except by an instrument in writing signed on behalf the Purchaser and the Seller.

# ARTICLE VI

## Miscellaneous

Section 6.1. *Notices*. All notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered by hand, when delivered by courier, three days after being deposited in the mail (registered or certified mail, postage prepaid, return receipt requested), or when received by facsimile transmission upon receipt of a confirmed transmission report, as follows:

If to the Purchaser:

> Portside Growth & Opportunity Fund
> c/o Ramius Capital Group, L.L.C
> 666 Third Avenue, 26th Floor
> New York, New York 10017
> Telecopy: (212) 201-4802
> Attention:   Jeffrey Smith
>              Michael Thoyer
>              Owen Littman

with a copy (for informational purposes only) to:

> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York 10022
> Telecopy: (212) 593-5955
> Attention: Eleazer N. Klein, Esq.

If to the Seller:

> Omicron Master Trust
> c/o Omicron Capital, L.P.
> 650 Fifth Avenue

> 24th Floor
> New York, New York 10019
> Telecopy: (212) 258-2315
> Attention: Olivier Morali

Any party hereto, by notice given to the other party hereto in accordance with this Section 6.1 may change the address or facsimile transmission number to which such notice or other communications are to be sent to such party.

Section 6.2. *Expenses.* Each of the Parties hereto shall pay its own expenses incident to this Agreement and the transactions contemplated herein.

Section 6.3. *Governing Law; Consent to Jurisdiction; Waiver of Jury Trial.* This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without reference to the choice of law principles thereof. Each of the Parties hereto irrevocably submits to the exclusive jurisdiction of the courts of the State of New York located in New York County and the United States District Court for the Southern District of New York for the purpose of any suit, action, proceeding or judgment relating to or arising out of this Agreement and the transactions contemplated hereby. Service of process in connection with any such suit, action or proceeding may be served on each Party hereto anywhere in the world by the same methods as are specified for the giving of notices under this Agreement. Each of the Parties hereto irrevocably consents to the jurisdiction of any such court in any such suit, action or proceeding and to the laying of venue in such court. Each Party hereto irrevocably waives any objection to the laying of venue of any such suit, action or proceeding brought in such courts and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. **EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO REQUEST A TRIAL BY JURY IN ANY LITIGATION WITH RESPECT TO THIS AGREEMENT AND REPRESENTS THAT COUNSEL HAS BEEN CONSULTED SPECIFICALLY AS TO THIS WAIVER.**

Section 6.4. *Assignment; Successors and Assigns; No Third Party Rights.* This Agreement may not be assigned by operation of law or otherwise, and any attempted assignment shall be null and void. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors, permitted assigns and legal representatives. This Agreement shall be for the sole benefit of the parties to this Agreement and their respective heirs, successors, permitted assigns and legal representatives and is not intended, nor shall be construed, to give any Person, other than the parties hereto and their respective heirs, successors, assigns and legal representatives, any legal or equitable right, remedy or claim hereunder.

Section 6.5. *Counterparts.* This Agreement may be executed in counterparts, each of which shall be deemed an original agreement, but all of which together shall constitute one and the same instrument.

Section 6.6. *Titles and Headings*. The titles and headings in this Agreement are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

Section 6.7. *Entire Agreement*. This Agreement constitute the entire agreement among the Parties with respect to the matters covered hereby and thereby and supersede all previous written, oral or implied understandings among them with respect to such matters.

Section 6.8. *Severability*. The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, such restriction shall be enforced to the maximum extent permitted by law.

Section 6.9. *Interpretation*. Unless otherwise indicated to the contrary herein by the context or use thereof: (i) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular Section or paragraph hereof; (ii) words importing the masculine gender shall also include the feminine and neutral genders, and vice versa; and (iii) words importing the singular shall also include the plural, and vice versa.

Section 6.10. *No Strict Construction*. Each of the Parties hereto acknowledges that this Agreement has been prepared jointly by the Parties hereto, and shall not be strictly construed against either Party.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers or other representatives thereunto duly authorized as of the day and year first above written.

OMICRON MASTER TRUST

By: OMICRON CAPITAL, L.P., as
Investment Advisor

By: OMICRON CAPITAL, INC.,
General Partner

By: _____/s/_____
Olivier H. Morali
Title: President


PORTSIDE GROWTH AND OPPORTUNITY FUND


By: _____
Name:
Title:

64.24.04.01

14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers or other representatives thereunto duly authorized as of the day and year first above written.

OMICRON MASTER TRUST

By: OMICRON CAPITAL, L.P., as Investment Advisor

By: OMICRON CAPITAL, INC., General Partner

By: _____

Olivier H. Morali
Title:

PORTSIDE GROWTH AND OPPORTUNITY FUND

By: _[signature]_____
Name: Jeff Smith
Title: Auth Sig

64.24.04.01

14

SCHEDULE 1

| Issuer | Name of Security | Original Principal / Shares | Principal Value as of June 19, 2006 | Accrued Interest/ Dividend as of June 16, 2006 | Number of Shares as of June 19, 2006 | Parity Value as of June 19, 2006 (US$) |
|---|---|---|---|---|---|---|
| Convertible Bonds | | | | | | |
| REDACTED | | | | | | |
| Convertible Preferred Stock | | | | | | |
| REDACTED | | | | | | |

SCHEDULE 1

| Issuer | Name of Security | Original Principal / Shares | Principal Value as of June 19, 2006 | Accrued Interest/ Dividend as of June 16, 2006 | Number of Shares as of June 19, 2006 | Parity Value as of June 19, 2006 (US$) |
|---|---|---|---|---|---|---|
| Gigabeam Corp. | Series B Convertible Preferred Stock 8% | 500 shares | $341,617 | $1,825 | REDACTED | $442,039 |
| | Unregistered Common Stock | | REDACTED | | | |

Total Parity Value for Calculation of Section 1.1(b): $62,750,606