amortization of the debt discount and beneficial conversation feature during the quarter.

At June 30, 2007 and December 31, 2006, the Company estimated the fair value of the Notes to be equal to their face value of $540,000 and $1,802,000, respectively.

As of August 1, 2007, the Company had not paid a total of $201,267 that was due and payable in cash to note holders as of the January 31, 2007 interest payment due date.

**Note payable to related party**

On March 27, 2007, Louis Slaughter, the Company's Chairman and Chief Executive Officer, loaned $65,000 to the Company through an interest-bearing note. The note bears interest at 7% per annum. The maturity date is March 26, 2008, with interest accruing to and payable on the maturity date. Interest expense on the loan through June 30, 2007 was $1,140.

16

**Note Payable to Investor**

On April 17, 2007, the Company issued a 14% secured promissory note in the principal amount of $500,000 to Midsummer Investment, Ltd., an existing investor. The principal purpose for the note issuance and related funding was to fund short-term working capital needs of the Company. The note was secured by the personal pledge of the Company's common stock shares owned by each of the Company's Chief Executive Officer and its Chief Technical Officer. The principal and related accrual interest was due upon the earlier of (1) written demand to the Company by Midsummer, or (2) December 31, 2007, or such later date as agreed to in writing by Midsummer. Midsummer maintained certain rights to convert the note amount plus any accrued interest into securities that might be issued subsequently by the Company in future equity or debt financings. This note was re-financed and canceled on May 22, 2007 as part of a $1 million one-year note.

On May 22, 2007, the Company issued a 14% secured debenture (the "Debenture") in the principal amount of $1 million to Midsummer. Additionally, the Company issued a total of 326,787 common stock warrants at an exercise price of $6.40. The warrants are exercisable immediately upon issuance and for a period thereafter of five years. The Debenture is governed by a securities purchase agreement and supplemental documents dated May 22, 2007. The Debenture is guaranteed by the Company's wholly-owned subsidiary, Gigabeam Service Corporation, through a subsidiary guarantee agreement.

The Debenture principal and related interest are collateralized by a security interest in all of the Company's inventories, as well as a pledge of the Company's common stock shares owned by each of the Company's Chief Executive Officer and its Chief Technical Officer. The principal and all accrued interest from the date of the Debenture are due and payable on May 22, 2008, or earlier if the Company receives a minimum of $2 million of other debt financings prior to the May 22, 2008 date. The Company has the right to prepay the Debenture and related accrued interest to date upon five business day notice to Midsummer without penalty.

The Debenture is subordinated to any outstanding principal and related interest payment related to the Company's 8% convertible Notes due February, 2008, but is senior to any future subordinated debt issued.

The common stock warrant exercise price is subject to customary adjustments for certain events and provisions as defined in the documents related to the issue of the Debentures.

Under the provisions of the Debentures, the existing $500,000 note between the Company and Midsummer, dated April 17, 2007, was merged into the $1 million Debenture and canceled. Net proceeds from the Debenture to the Company were $413,210, which represents the $1 million principal of the Debenture less the assumption of the existing $500,000 Note, and less accrued interest on the April 17, 2007 note as of the May 22, 2007 date of $6,790 and less legal and other fees of $80,000.

The Company accounted for the Debenture transaction under the Provisions of SFAS No. 133, EITF 00-19 and other GAAP requirements related to securities issued with detachable warrants. The Company estimated the fair value of the warrants issued as of the date of issuance using the Black-Scholes model. The resulting fair value of $390,431 was recorded as a debt discount, which is being amortized over the life of the Debenture as a component of interest expense. Through June 30, 2007, the Company has amortized $42,297 of the discount assigned.

**Capital leases**

The Company entered into various capital leases for test equipment. As of June 30, 2007, the future minimum payments under leases are as follows:

17

Year ended December 31,

| | |
|---|---:|
| 2007 | $ 17,982 |
| 2008 | 20,393 |
| 2009 | 9,744 |
| 2010 | 9,744 |
| 2011 | 6,498 |
| Total payment obligation | 64,361 |
| Less amount representing interest | (8,466) |
| Present value of net minimum obligation | 55,895 |
| Less current portion | (28,899) |
| Non current portion | $ 26,996 |

**5. Income Taxes**

The Company adopted the provisions of FIN 48 on January 1, 2007. The adoption of FIN 48 did not result in an adjustment to the beginning balance of retained earnings and also did not result in any material adjustments to reserves for uncertain tax positions.

At January 1, 2007, the Company had a U.S. net operating loss carry forward (NOL) of approximately $33 million. The Company also had a net deferred tax asset of approximately $16.5 million related to these NOLs. Due to the uncertainties surrounding the Company's ability to generate future taxable income to realize these assets, a full valuation reserve has been established to offset the net deferred tax asset. Additionally future utilization of the NOL to offset future taxable income may be subject to a substantial annual limitation as result of Section 382 ownership changes that may have occurred previously or that may occur in the future.

The Company's policy for recording interest and penalties associated with tax audits is to record such items as a component of the provision for income taxes. In conjunction with the adoption of FIN 48, the Company did not accrue any interest or penalties at January 1, 2007. To the extent interest and penalties are not ultimately incurred with respect to uncertain tax positions, amounts accrued will be reduced and reflected as a reduction of the overall income tax provision.

In all of the significant federal and state jurisdictions where it is required to file income tax returns, the Company has analyzed filing positions for all tax years where the statute is open. The only periods subject to examination by the major tax jurisdictions where the Company does business are the 2004 through 2006 tax years. The Company does not believe that the outcome of any examination will have a material impact on its financial statements.

The Company does not currently estimate any additional material reasonably possible uncertain tax positions occurring within the next twelve months.

No provision for federal or state income taxes has been recorded for the three and six months ended June 30, 2007 as the Company incurred net operating losses for all periods presented for all jurisdictions in which it operates.

There is no increase recorded through June 30, 2007 related to material changes to the measurement of unrecognized tax benefits in various taxing jurisdictions. There have been no tax audit or reviews initiated by the IRS or any state tax authority during the three months ended June 30, 2007 or through the date of this report.

The Company estimates that it is reasonably possible that no reduction in unrecognized benefits may occur in the next twelve months due primarily to the expiration of the statute of limitations in various state and local jurisdictions. The Company does not currently estimate any additional material reasonably possible uncertain tax positions occurring within the next twelve-month time frame.

**6. Equity Issues**

During the period May 6, 2005 through July 26, 2005, the Company completed a private placement of 11,277 shares of its 10% Series A Redeemable Preferred Stock ("Series A Stock"), with a stated value of $700 per share, and 1,127,700 common stock purchase warrants for aggregate proceeds of $7,950,285, before payment of approximately $1,250,000 in placement and legal fees. Dividends are payable, at the rate of 10% per year, semi-annually, commencing November 15, 2005. Dividends can be paid, at the Company's option, in either cash or shares of its common stock. At any dividend date, if the Company chooses to make the dividend payment in shares of common stock, the number of shares to be issued will be based on a ten trading days volume weighted average price per share of the common stock ending five trading days before the dividend date.

Each warrant is exercisable to purchase one share of common stock at an exercise price of $7.00 per share until January 28, 2011.

In the event the Company conducts a financing with gross proceeds of $30 million or more (a "Qualified Financing"), holders of the Series A Stock will have the right to exchange all or a portion of their then outstanding shares into securities identical to those issued in the Qualified Financing, at an exchange rate per share equal to the then-applicable redemption price of the shares. Following the completion of a Qualified Financing, shares of Series A Stock still outstanding are mandatorily redeemable, in accordance with the terms of the Certificate of Designation governing the Series A Stock. Prior to the completion of a Qualified Financing, the Company may redeem all or any of the outstanding shares of the Series A Stock in cash, and upon notice annually on May 15 at a stipulated premium price, which declines annually until May 15, 2010, when the redemption price will be at the $700 per share stated price.

In June and July 2005, the Company issued 92,500 shares of its common stock in an offshore offering as part of a transaction that included 92,500 common stock purchase warrants for aggregate proceeds of $652,125, before payment of approximately $75,000 in placement and legal fees. The stated price of each unit was $705. Each warrant is exercisable to purchase one share of common stock at an exercise price of $7.00 per share until January 28, 2011. The warrants have been listed together with warrants issued with the Series A stock and with warrants issued in February 2005 related to the Company's $2,500,000 Notes financing (the "Z warrants") on the Nasdaq Capital Market under the symbol "GGBMZ".

On November 15, 2005, the Company paid the first required dividend on the Series A stock in shares of common stock. The total shares issued to holders of the Series A stock were 42,392 based on the formula as noted above. On May 15, 2006 and November 15, 2006, the Company paid the semi-annual required dividend through the issuance of 31,798 shares and 59,941 shares of common stock, respectively, based on the stated formula.

The common stock, the Z warrants described above and the IPO warrants commenced trading on the Nasdaq Capital Market on March 27, 2006. Prior to March 27, 2006 the common stock, Z warrants and IPO warrants were traded on the Over-the-Counter Bulletin Board.

19

On November 7, 2005, the Company issued 18,900 shares of its variable dividend series B convertible preferred stock ("Series B stock"), and 1,302,191 common stock purchase warrants at a price of $1,000 per unit for gross proceeds of $18,900,000 before payment of placement fees of approximately $1,323,000 and other related expenses of approximately $125,000, resulting in net proceeds to the Company of approximately $17,452,000 in a private placement of such securities to institutional investors. The proceeds from the issuance of the Series B stock and warrants were allocated between the Series B stock and the warrants based on the relative fair value of the components. The proceeds allocated to the shares were compared to the par value of the common stock that would be received upon conversion and the Company determined that a beneficial conversion feature existed. The Company estimated the fair value of such beneficial conversion feature, through use of the Black-Scholes model, to be $3,936,794. The value of the beneficial conversion feature is recognized as interest expense.

Pursuant to the anti-dilution provisions contained in the Certificate of Designation of Preferences, Rights and Limitations of the Series B stock, at the time of any issuance of common stock or common stock equivalents at an effective price below the conversion price then in effect, the conversion price of the Series B Stock shall be adjusted to the effective price of the subsequently issued common stock or common stock equivalents as of the date of such issue. On August 21, 2006, the Company issued 10,000 shares of its variable dividend Series C convertible preferred stock ("Series C stock") with a conversion price of $6.10 which was below the Series B stock conversion price. Consequently, the original conversion price of the Series B Stock of $7.6199 per share was adjusted to equal the effective price of the variable dividend Series C stock of $6.10 that the Company issued in August 2006. Based upon the adjusted conversion price of $6.10 per share, and based upon the number of outstanding shares of Series B stock at August 21, 2006 (15,300), the number of common shares issuable upon conversion of the Series B Stock was adjusted from 2,007,906 shares to 2,508,204 shares.

Additionally, pursuant to the anti-dilution provisions of the warrants issued to the holders of the Series B stock, the number of shares of common stock issuable upon exercise of the warrants issued to the Series B Stock shareholders has been adjusted from 1,274,630 shares to 1,668,032 shares and the exercise price has been adjusted from $7.9827 to $6.10.

The variable dividend rate on the Series B stock is 8% per annum for the first three years, then 11% for the fourth year, and 14% thereafter.

The Company may redeem any then outstanding shares of the Series B stock in whole or in part, after November 7, 2008, subject to certain conditions and limitations, upon appropriate notice, at a cash redemption price equal to 110% of the stock's stated value if redeemed prior to November 7, 2009, and at 100% of the stated value after November 7, 2009.

Under terms of the Series B stock, so long as any shares of the Series B stock remain outstanding, the Company is prohibited from paying dividends on its common stock or other designated junior securities, other than dividend payments in the ordinary course under its Series A stock provided the Company is current in its obligations under our Series B stock, and the terms of its Series A stock have not been amended since November 7, 2005.

Dividends on the Series B stock are due quarterly on the first day of January, April, July and October to shareholders of record on the immediately preceding day of the prior month. Dividends are payable in cash unless certain stipulated events have occurred or are reached, and unless the daily trading volume for the Company's common stock on the trading market exceeds 20,000 shares per trading day for 20 consecutive trading days prior to the specified dividend date. Should the stipulated events occur and the minimum trading volume noted reached, and if funds required for the quarterly dividend payment are legally available, solely at the Company's election, the dividend may be paid in cash or in shares of the Company's common stock.

On January 3, 2006, April 1, 2006, July 3, 2006 and October 2, 2006, the Company paid the quarterly dividend to holders of Series B stock in cash amounting to $231,034, $371,311, $319,067, and $314,781, respectively, since

the 20 trading days' average trading volume in the Company's stock did not exceed the threshold 20,000 share figure noted above. In January 2007, to conserve cash, the Company requested a waiver from the Series B shareholders to receive their quarterly dividend in shares of the Company's common stock in lieu of a cash dividend. All of the Series B preferred shareholders agreed to the waiver except one, who elected a cash dividend. Consequently, in January 2007, the Company issued 70,203 shares of its common stock and agreed to pay the non-waiving shareholder $4,000 in cash. Subsequently, the non-waiving shareholder agreed to take the dividend in shares as well. In April 2007, the Company issued a total of 941 shares of the Company's common stock to this shareholder in lieu of cash. The shares of common stock were valued at $4.2449 (90% of the average of the Volume Weighted Average Price ("VWAP") for the 20 consecutive trading days ending December 29, 2006). In addition, in consideration for agreeing to the waiver, the Company agreed to issue a number of its common stock purchase warrants equal to 50% of the number of shares of common stock issued as payment for the January 2007 stock dividend. The Company issued, with the dividend shares, a total of 35,572 common stock warrants to the Series B shareholders at an exercise price of $6.39 per share. The Company has treated the warrants as equity securities under the requirements of EITF 00-19. Using the Black-Scholes model, the Company has calculated the fair value of the warrants issued, and included the fair value in the equity section of its balance sheet as of June 30, 2007.

20

On August 21, 2006, the Company issued 10,000 shares of its Series C stock with a conversion price of $6.10 per common share and warrants to purchase an aggregate of 860,651 shares of common stock for gross proceeds of $10 million resulting in net proceeds of $9,224,705 after payment of placement fees and other expenses of $775,295. The proceeds from the issuance of the Series C stock and warrants were allocated between the Series C stock and the warrants based on the relative fair value of the components. The proceeds allocated to the shares were compared to the par value of the common stock that would be received upon conversion and the Company determined that a beneficial conversion feature existed. The Company has estimated the fair value of such beneficial conversion feature, through use of the Black-Scholes model, to be $2,252,398. The value of the beneficial conversion feature is recognized as interest expense.

The conversion price of the Series C stock is $6.10 per share, subject to adjustment as set forth in the Certification of Designation of Preferences, Rights and Limitations covering the Series C stock.

The exercise price of the common stock purchase warrants issued to holders of the Series C stock is $6.39, subject to adjustment.

The variable dividend rate on the Series C stock is 8% per annum for the first three years, 11% for the fourth year and 14% thereafter.

The Company may redeem the outstanding Series C stock in whole or in part after August 21, 2009, subject to certain conditions and limitations upon appropriate notice at a cash redemption price equal to 110% of the stated value if redeemed prior to August 21, 2010, and at 100% of the stated value if redeemed after August 21, 2011.

Under terms of the Series C stock, so long as any shares of the Series C stock remain outstanding, the Company is prohibited from paying dividends on its common stock or other designated junior securities, other than dividend payments in the ordinary course under the Company's Series A stock and Series B stock provided the Company is current in its obligations under our Series C stock, and that the terms of the Series A stock have not been amended since November 7, 2005.

Dividends on the Series C stock are due quarterly on the first day of January, April, July and October to shareholders of record on the immediately preceding day of the prior month. Dividends are payable in cash unless certain stipulated events have occurred or are reached, and unless the daily trading volume for the Company's common stock on the trading market exceeds 20,000 shares per trading day for 20 consecutive trading days prior to the specified dividend date. Should the stipulated events occur and the minimum trading volume noted reached, and if funds required for the quarterly dividend payment are legally available, solely at the Company's election, the dividend may be paid in cash or in shares of the Company's common stock.

On October 2, 2006, the Company paid the quarterly dividend to holders of Series C stock in cash, amounting to $91,111, since the 20 trading days average trading volume in its stock did not exceed the threshold 20,000 share figure noted above. In January 2007, in order to conserve cash, the Company requested a waiver from the Series C preferred shareholders in order to pay their quarterly dividend in shares of the Company's common stock in lieu of a cash dividend. All of the Series C preferred shareholders agreed to the waiver except two, who elected a cash dividend. Consequently, in January 2007, the Company issued 43,344 shares of its common stock and agreed to pay the non-waiving shareholders $16,000 in cash. Subsequently, the non-waiving shareholders agreed to take the dividend in shares as well. In April 2007, the Company issued a total of 3,771 shares of its common stock to these shareholders in lieu of cash. The shares of common stock were valued at $4.2449 (90% of the average of the VWAP for the 20 consecutive trading days ending December 29, 2006). In addition, in consideration for agreeing to the waiver, the Company agreed to issue a number of its common stock purchase warrants equal to 50% of the number of shares of common stock issued as payment for the January 2007 dividend. The Company issued, with the dividend shares, a total of 23,558 common stock warrants to the Series C shareholders at an exercise price of $6.39 per share. The Company has treated the warrants as equity securities under the requirements of EITF 00-19.

Using the Black-Scholes model, the Company calculated the fair value of the warrants issued, and included the fair value in the equity section of its balance sheet at June 30, 2007.

21

In April 2007, again to conserve cash, the Company requested a waiver from the Series B and Series C shareholders to receive their quarterly dividend for the quarter ended March 31, 2007 in shares of its common stock in lieu of a quarterly cash dividend. Additionally, in consideration for agreeing to the waiver, the Company offered to the holders of the Series B and Series C stock a number of its common stock purchase warrants equal to 50% of the number of shares of common stock issued as payment for the April 2007 dividend.

All of the Series B and Series C shareholders agreed to the waiver and to payment of the dividends in shares with the related issuance of warrants. Consequently, in April 2007, the Company issued 104,473 shares of its common stock to the Series B stockholders and 69,187 shares to the Series C stockholders. The shares of common stock were valued at $2.8907 (90% of the VWAP for the 20 consecutive trading days ending March 30, 2007), and issued common stock purchase warrants to such stockholders equal to 50% of the number of common stock shares issued in payment for the April 2007 dividends.

In July 2007, the Company requested an additional waiver from the Series B and Series C shareholders to receive their quarterly dividend for the quarter ended June 30, 2007 in shares of its common stock in lieu of a quarterly cash dividend. Additionally, in consideration for agreeing to the waiver, the Company offered to the holders of the Series B and Series C stock a number of its common stock purchase warrants equal to 50% of the number of shares of common stock that would be issued as payment for the July 2007 dividend. Should all of the Series B and Series C shareholders accept the offered stock, the Company would issue 198,474 shares of its common stock and common stock purchase warrants equal to 50% of this amount.

On June 29, 2007, the Company authorized a total of 475,000 warrants with an exercise price of $2.69 to Trilogy Capital Partners for consulting services to be performed after July 1, 2007. These warrants are accounted for in accordance with EITF 96-18; with expense recorded as services are provided.

On June 29, 2007, the Company authorized a total of 100,000 warrants with an exercise price of $2.69 to Sierra Equities for consulting services to be performed after July 1, 2007. These warrants are accounted for in accordance with EITF 96-18; with expense recorded as services are provided.

### 7. Commitments and contingencies

The Company leases certain office space, roof rental rights and equipment under non cancelable operating leases.

Future minimum lease payments under these operating leases are as follows:

| | |
|---|---:|
| 2007 | $ 254,725 |
| 2008 | 285,459 |
| 2009 | 137,761 |
| 2010 | 135,663 |
| 2011 | — |
| | $ 813,608 |

Rental expense for operating leases was $456,155 and $300,854 through the six months ended June 30, 2007 and 2006, respectively.

On October 13, 2004, the Company's employment agreements with Messrs. Slaughter and Lockie became effective. The Company's employment agreement with Mr. Peck commenced in May 2004. Each employment agreement establishes, among other things, base salary levels at amounts designed to be competitive with executive positions at similarly situated companies. Messrs. Slaughter, Lockie, and Peck are entitled to receive annual base

salaries of $250,000, $225,000 and $194,250, respectively, effective January 1, 2006. These agreements were amended effective September 26, 2006, to reduce these officers' salary levels to $125,000, $112,500 and $145,687, respectively. These annual base salaries will be reviewed annually and may be increased by the board of directors or compensation committee. In addition to their base salaries, each executive is eligible to participate in any bonus plans or incentive compensation programs that the Company may establish from time to time.

22

The Company may be obligated to make severance payments to these executives under their employment agreements. Pursuant to their employment agreements, the Company may terminate the agreements for cause at any time and without cause upon 30 days written notice. Any of these executives may terminate his employment agreement for good reason, upon 60 days written notice, if his duties are substantially altered or reduced, his salary is reduced or the Company materially breaches his agreement. If the Company terminates the employment of the executive without cause or if the executive terminates his agreement for good reason, the Company must pay the executive his base salary for a severance term of eighteen months in the case of Messrs. Slaughter and Lockie and twelve months in the case of Mr. Peck; provided, however, that in order to receive the severance payment, the executive officer must sign a general release.

Each of the employment agreements contains restrictive covenants to protect the Company for non-competition, non-solicitation/non-piracy and non-disclosure during the term of the agreement and for a period of two years after its termination or expiration and requires the Company to indemnify the executive for liability incurred as a result of acts performed by him in his capacity as an officer of the Company, including reasonable legal expenses.

As of May 18, 2007, the Company and ThinKom Solutions, Inc. have agreed to terminate the 2004 strategic supply agreement, as amended, between the companies, with the agreement that no further obligations are owed by either party.

On or about April 24, 2007, the landlord of the Company's Waltham, Massachusetts office filed a breach of lease claim for non-payment of rent in the State of Massachusetts, Superior Court of Suffolk County seeking damages in the amount of approximately $174,637 and executed an attachment in the amount of $50,000. The Company has recorded liabilities for 100% of this claim in the accompanying condensed consolidated financial statements.

On or about May 7, 2007, the Company was verbally notified by its customer, the Ministry of Interior for the Kingdom of Bahrain that a Bahraini court had ordered the Ministry of the Interior to cease payments under certain sales orders pending resolution of a claim filed by a former reseller for the Company in the Middle East and African region. The Company believes this case has no merit and plans to vigorously defend itself. No accrual has been recorded in the accompanying condensed consolidated financial statements.

On or about August 3, 2007, Portside Growth and Opportunity Fund filed a complaint for the issuance of 222,057 shares of common stock in lieu of 56,066 shares of common stock, due to a triggering event claimed by Portside Growth and Opportunity Fund in the agreements between the Company and Portside Growth and Opportunity Fund. The Company is disputing with Portside Growth and Opportunity Fund on the existence of the triggering event and the fact that no harm was caused. The Company plans to vigorously defend itself and believes it will be successful in such defense. No accrual has been recorded in the accompanying condensed consolidated financial statements.

**8. Subsequent Events**

In July 2007, the Company requested an additional waiver from the Series B and Series C shareholders to receive their quarterly dividend for the quarter ended June 30, 2007 in shares of the Company's common stock in lieu of a quarterly cash dividend. Additionally, in consideration for agreeing to the waiver, the Company offered to the holders of the Series B and Series C stock a number of common stock purchase warrants equal to 50% of the number of shares of common stock that would be issued for the July 2, 2007 dividend due. Should all of the Series B and Series C shareholders accept the offered stock, the Company would issue, based upon a formula contained in the preferred stock documents, 198,474 shares of its common stock and common stock purchase warrants equal to 50% of this amount.

On July 27, 2007, the Company accepted the resignation of Leighton J. Stephenson, its Chief Financial Officer since June 2005. He resigned his position effective July 31, 2007 in order to return to his residence in Denver,