UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PORTSIDE GROWTH AND OPPORTUNITY
FUND,

                                    Plaintiff,

            -against-

GIGABEAM CORPORATION,

                                    Defendant

Case No. 07 Civ. 6990 (NRB)

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

---

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP
*Attorneys for Plaintiff*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(212) 451-2300

554238-4

Table of Contents

Page

Preliminary Statement..............................................................................................1

Statement of Facts..................................................................................................2

    The Parties .......................................................................................................2

    GigaBeam's Sale of Preferred Stock ...............................................................2

    Portside's Purchase of Preferred Stock............................................................3

    Portside's Redemption of Preferred Stock.......................................................4

Argument ...............................................................................................................6

    I       PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT .................................6

          A.    The Standard of Review...........................................................................6

          B.    The Court Should Enforce the Plain Meaning of the Parties'
               Agreements ...............................................................................................7

          C.    Portside's Money Damages Can Be Calculated as a Matter of Law .........10

          D.    Portside is Also Entitled to Equitable Relief ............................................14

          E.    Portside is Entitled to Additional Relief...................................................15

Conclusion ...........................................................................................................17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PORTSIDE GROWTH AND OPPORTUNITY
FUND,

                                        Plaintiff,

                -against-                                    Case No. 07 Civ. 6990 (NRB)

GIGABEAM CORPORATION,

                                        Defendant

---

<u>PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT</u>

Plaintiff Portside Growth and Opportunity Fund ("Portside"), by its attorneys, Olshan

Grundman Frome Rosenzweig & Wolosky LLP, submits this memorandum in support of its

motion for summary judgment.

<u>Preliminary Statement</u>

Plaintiff Portside holds 342 shares of preferred stock issued by defendant GigaBeam

Corporation ("GigaBeam") with a stated value of $342,000. In July 2007, Portside exercised

redemption rights provided by the Certificate of Designation governing GigaBeam's preferred

stock, electing to receive shares of GigaBeam common stock in accordance with a contractual

formula. Portside's right of redemption arose from the undisputed fact that GigaBeam had failed

to maintain an effective registration statement with the Securities and Exchange Commission

("SEC") for more than sixty (60) calendar days. GigaBeam denied Portside's redemption notice

and refused to issue to Portside the shares of common stock to which it was entitled. Because

the parties' agreements are clear and unambiguous and GigaBeam's breach of those agreements

is undisputed, Portside is entitled to summary judgment.

554238-4

Statement of Facts

The facts set forth below are based upon the accompanying Declaration of Jeffrey C. Smith, dated October 5, 2007, and its exhibits.

The Parties

Plaintiff Portside is a private investment fund that often participates in private placements. In a private placement, Portside purchases equity or debt securities directly from the issuer. The securities purchased by Portside often include convertible securities, including preferred stock, that are convertible, at Portside's option, into the issuer's common stock.

Defendant GigaBeam is a Delaware corporation with its principal place of business in Virginia. According to its SEC filings, GigaBeam was incorporated in January 2004 and became a public company in October 2004. Its shares of common stock trade on Nasdaq under the ticker symbol "GGBM." GigaBeam sells wireless telecommunications equipment.

GigaBeam's Sale of Preferred Stock

In November 2005, GigaBeam raised approximately $18 million through a private placement of Series B Convertible Preferred Stock (the "Preferred Stock"). To effectuate the sale, GigaBeam adopted a Certificate of Designation of Preferences, Rights and Limitations of Series B Convertible Preferred Stock (the "Certificate of Designation"). (Ex. A) The Certificate of Designation provided, among other things, that the Preferred Stock could be converted into shares of common stock based upon a stated value of $1,000 for each share of Preferred Stock and an initial value of $7.61 for each share of common stock, subject to adjustment.

In addition, GigaBeam entered into a Registration Rights Agreement (the "Registration Rights Agreement") under which it became obligated to file a registration statement with the SEC for the shares of common stock into which the Preferred Stock could be converted. (Ex. B § 2) This registration statement is referred to as the "Conversion Shares Registration Statement."

2

554238-4

Under the Registration Rights Agreement, GigaBeam became obligated to file the Conversion

Shares Registration Statement within 30 days of the closing of the sale of the Preferred Stock.

Furthermore, the Registration Rights Agreement expressly set forth GigaBeam's obligation to

maintain the effectiveness of the Conversion Shares Registration Statement:

> . . . the Company shall use its best efforts to cause a Registration
> Statement to be declared effective under the Securities Act as
> promptly as possible after the filing thereof, but in any event prior
> to the applicable Effectiveness Date, and **shall use its best efforts**
> **to keep such Registration Statement continuously effective**
> **under the Securities Act until all Registrable Securities covered**
> **by such Registration Statement have been sold or may be sold**
> **without volume restrictions pursuant to Rule 144(k)** as
> determined by the counsel to the Company pursuant to a written
> opinion letter to such effect, addressed and acceptable to the
> Company's transfer agent and the affected Holders (the
> "Effectiveness Period").

(Ex. B § 2(a))  (emphasis added)

Accordingly, by the clear and unambiguous language contained in the Registration Rights

Agreement, the "Effectiveness Period" extends "until all Registrable Securities covered by such

Registration Statement have been sold or may be sold without volume restrictions pursuant to

Rule 144(k) . . . ."  (Ex. B § 2(a)).  SEC Rule 144(k) permits the sale, without restriction, of

securities that are unregistered if they have been held for at least two years.  17 C.F.R.

§ 230.144(k).

<u>Portside's Purchase of Preferred Stock</u>

In June 2006, plaintiff Portside acquired 342 shares of Preferred Stock from Omicron

Master Trust ("Omicron"), an original investor in GigaBeam's private placement of the Preferred

Stock.  (Ex. C)  Omicron provided notice to GigaBeam of the transfer, with instructions to issue

a new certificate in Portside's name.  (Ex. D)  GigaBeam later issued this certificate to Portside.

3

554238-4

(Ex. E)  The Conversion Shares Registration Statement was effective when Portside made its purchase.

Prior to this litigation, GigaBeam had never disputed the validity of the transfer of Portside's shares of Preferred Stock from Omicron.  To the contrary, in addition to issuing a new certificate for the shares in Portside's name, since June 2006, Portside has received notices from GigaBeam as a holder of Preferred Stock.  Moreover, on October 4, 2006, GigaBeam amended the Conversion Shares Registration Statement to list Portside as a "Selling Stockholder."  (Ex. F)

Portside's Redemption of Preferred Stock

The Certificate of Designation granted Portside the right to require GigaBeam to redeem Portside's shares of Preferred Stock upon the occurrence of a "Triggering Event."  (Ex. A § 9(a)) One such "Triggering Event" would occur if GigaBeam failed to maintain the effectiveness of the Conversion Shares Registration Statement:

> "Triggering Event" means . . . if, during the Effectiveness Period, the effectiveness of the Conversion Shares Registration Statement lapses for any reason for more than an aggregate of 60 calendar days (which need not be consecutive days) during any 12 month period . . . ."

(Ex. A § 9(a)(ii))

By letter dated April 25, 2007, GigaBeam notified Portside, as a holder of Preferred Stock, that the SEC had suspended the effectiveness of the Conversion Shares Registration Statement.  (Ex. G)  There is no dispute that the effectiveness of the Conversion Shares Registration Statement was suspended for more than sixty days after April 25, 2007.

The Certificate of Designation provides holders of Preferred Stock, including Portside, with certain express rights.  Specifically, upon the occurrence of a "Triggering Event" of the type described above, a holder of Preferred Stock is entitled to redeem its Preferred Stock and receive from GigaBeam the number of shares of common stock equal to (i) the "Triggering Redemption

4

Amount" divided by (ii) 75% of the average of recent trading prices of such common stock. (Ex. A § 9(b))

On July 10, 2007, Portside delivered a redemption notice to GigaBeam (the "Initial Redemption Notice") demanding the delivery of 166,532 shares of Common Stock based on a Triggering Redemption Amount[1] of $451,486.26 and an applicable trading price average of approximately $2.71. (Ex. H) On July 18, 2007, Portside corrected a computational error in its notice and demanded 222,043 shares, an increase of 55,411 shares (the "Amended Redemption Notice"). (Ex. I) At the time of each redemption notice, the Conversion Shares Registration Statement remained suspended. Accordingly, the criteria for a "Triggering Event," namely that the Conversion Shares Registration Statement had lapsed for more than sixty calendar days during the prior twelve months, were satisfied.

Under the Certificate of Designation, GigaBeam was obligated to deliver shares of common stock "within five Trading Days of the date on which the notice for the payment therefor is provided by a Holder." (Ex. A § 9(b)) Because the Initial Redemption Notice was sent on July 10, 2007, GigaBeam was obligated to deliver 166,532 shares of common stock by July 17, 2007; in response to the Amended Redemption Notice, GigaBeam was obligated to deliver an additional 55,411 shares by July 25, 2007.

In breach of its agreement with Portside, GigaBeam has refused to deliver any shares of common stock to Portside. Despite the clear and unambiguous language of the contract, GigaBeam has taken the position that its failure to maintain an effective Conversion Shares

---

[1] The Certificate of Designation defines the "Triggering Redemption Amount" as follows: "Triggering Redemption Amount" for each share of Preferred Stock means the sum of (i) the greater of (A) 130% of the Stated Value and (B) the product of (a) the VWAP on the Trading Day immediately preceding the date of the Triggering Event and (b) the Stated Value divided by the then Conversion Price, (ii) all accrued but unpaid dividends thereon and (iii) all liquidated damages and other amounts due in respect of the Preferred Stock." (Ex. A at p. 9) The computation of this amount appears in paragraph 12 of the Smith Declaration.

5

Registration Statement until all shares could be sold under Rule 144(k) is not a breach of the Certificate of Designation. According to GigaBeam, the fact that Portside was eligible to sell shares of common stock under certain provisions of Rule 144 (but not Rule 144(k), as expressly required by the Registration Rights Agreement) precluded Portside from exercising its redemption rights under the Certificate of Designation. As we shall demonstrate below, GigaBeam's theory cannot be reconciled with the plain terms of the parties' agreements.

Argument

I

PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT

A.    The Standard of Review

A motion for summary judgment shall be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R Civ. P. 56(c). The party seeking summary judgment bears the burden of showing that no issue of fact exists. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997). Summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Golden Pacific Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004). In order to avoid summary judgment, the nonmoving party must "go beyond the pleadings and 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Creative Waste Mgmt., Inc. v. Capitol Envtl. Services., Inc.*, 458 F.Supp.2d 178, 185 (S.D.N.Y. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, the party resisting summary judgment must not only show a disputed issue of fact, but it must be a material fact in light of substantive law. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Even if the parties dispute material

6

facts, summary judgment will be granted unless the dispute is 'genuine,' *i.e.*, unless 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Golden Pacific Bancorp*, 375 F.3d at 200 (quoting *Anderson*, 477 U.S. at 249).

       B.    <u>The Court Should Enforce the Plain Meaning of the Parties' Agreements</u>

      Summary judgment is appropriate where, as here, there is an undisputed breach of the clear and unambiguous terms of a contract. To establish a right to recover for breach of contract, a party must prove: (i) the existence of a contract; (ii) performance of the contract by the injured party; (iii) breach by the other party; and (iv) damages. *See, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004).

      The Certificate of Designation is governed by Delaware law. (Ex. A § 11(d)) Under Delaware law, a certificate of designation for preferred shares "is interpreted using standard rules of contract interpretation which require the court to determine from the language of the contract the intent of the parties." *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996). *See also NBC Universal, Inc. v. Paxson Communications Corp.*, No. Civ. A. 650-N, 2005 WL 1038997, at * 5 (Del. Ch. April 29, 2005) ("A corporate certificate of designation is interpreted using standard rules of contract interpretation.").

      In addition, "[u]nder Delaware law, the 'proper construction of any contract . . . is purely a question of law.'" *Meritxell, Ltd. v. Saliva Diagnostic Systems, Inc.*, No. 96 CIV. 2759, 1998 WL 40148, at *5 (S.D.N.Y. Feb. 2, 1998) (quoting *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)); *see also AHS New Mexico Holdings, Inc. v. Healthsource, Inc.*, No. Civ. A. 2120-N, 2007 WL 431051, at *3 (Del. Ch. Feb. 2, 2007) ("Under general principles of contract law, interpretation of contractual language is purely a question of law."). "[S]ummary judgment is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact." *NBC*

7

*Universal, Inc.*, 2005 WL 1038997, at * 5. "In construing the meaning of written contracts, the court's first obligation to the parties is to determine the nature and scope of the contractual rights and obligations [the parties] created and to enforce those rights and obligations in accordance with the law." *Meritxell*, 1998 WL 40148, at *6 (quoting *US West, Inc. v. Time Warner, Inc.*, Civ. A. No. 14555, 1996 WL 307445, at *9 (Del. Ch. June 6, 1996)).

<u>GigaBeam's Breach of the Express Language of the Contract is Undisputed</u>

The facts regarding GigaBeam's breach of contract are not in dispute.

First, Portside was a holder of 342 shares of Preferred Stock, as recognized by GigaBeam.

Second, GigaBeam concedes that the Conversion Shares Registration Statement ceased to be effective on April 25, 2007. There is no dispute that it did not become effective for more than sixty (60) days thereafter and that it was not effective at the time Portside submitted its redemption notices.

Third, Portside made a valid demand for redemption on July 10, 2007, seeking payment of the "Triggering Redemption Amount" in the form of shares of GigaBeam common stock, which was corrected by the Amended Redemption Notice sent July 18, 2007.

Finally, GigaBeam did not deliver the shares of common stock to which Portside was entitled, or any other consideration.

<u>GigaBeam's Proffered Excuse for its Breach is Supported Neither by the Relevant Contracts nor Applicable Law</u>

GigaBeam's principal defense has rested on the theory that Portside's ability to convert its shares of Preferred Stock into common stock and sell them in the public markets pursuant to certain provisions of Rule 144 (but not Rule 144(k), as expressly required by the Registration Rights Agreement) precluded Portside from exercising its contractual right to redemption.

8

554238-4

GigaBeam does not contend that any word or phrase in the Certificate of Designation is ambiguous or unclear. Rather, it claims that the alleged purposes of the Registration Rights Agreement would be better effectuated if GigaBeam did not have an obligation to maintain an effective Conversion Shares Registration Statement for two years. As a matter of law, the Court may not re-write the parties' agreement. *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) ("Delaware observes the well-established general principle that . . . it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement."). This is especially so where the agreement is a highly detailed contract negotiated at arm's length between sophisticated parties. *See, e.g., Weston Investments, Inc. v. Domtar Indus., Inc.*, 2002 WL 31011141, at *6 (Del. Super. 2002) (In "a contract dispute between sophisticated, well represented, equal bargaining partners who negotiated at arm's length and consummated a deal" the court stated it "'is not the proper role of a court to rewrite or supply omitted provisions to a written agreement.'") (quoting *Cincinnati SMSA*, 708 A.2d at 992).

GigaBeam suggests that the resale restrictions imposed by Rule 144 on a selling shareholder who, like Portside, has held unregistered securities for more than one year (but less than the two years that, pursuant to Rule 144(k), would permit resales without restriction) are not material, and thus Portside was not harmed by GigaBeam's failure to maintain the effectiveness of the Conversion Shares Registration Statement. This is both incorrect and irrelevant. Under the one-year exemption available under Rule 144, Portside would be required to give notice to the market of its plans to sell and would also be limited in the manner of sale, among other things. 17 C.F.R. §§ 230.144 (e),(f). More important, the redemption provision reflects GigaBeam's assurance to investors that it would be able to satisfy the reporting and other

9

requirements necessary to have an effective registration statement in place for two years. Once GigaBeam failed to honor that promise, the parties' agreement established a redemption right for holders of Preferred Stock. Portside is entitled to the benefit of that bargain.

    C.    <u>Portside's Money Damages Can Be Calculated as a Matter of Law</u>

       Under Delaware law, damages for breach of a contract to deliver securities are based on the highest intermediate value of the securities between the date of the breach and a reasonable period thereafter. *See Duncan v. TheraTx, Inc.*, 775 A.2d 1019 (Del. 2001); *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 20 (Del. Ch. 2003); *American General Corp. v. Continental Airlines Corp.*, 622 A.2d 1 (Del. Ch. 1992), *aff'd* 620 A.2d 856 (Table) (Del. 1992); *Haft v. Dart Group Corp.*, 877 F. Supp. 896, 902 (D. Del. 1995). Delaware courts apply this rule, adopted from conversion cases to breach of contract cases, because where a plaintiff was wrongfully deprived of the ability to sell securities he was contractually entitled to sell, "[t]he injury that the plaintiff suffers is the deprivation of his range of elective action, and by applying the conversion measure of damages a court endeavors to restore that range of elective action." *American General*, 622 A.2d at 10. The plaintiff is not required to show that he would have sold the securities at the time they should have been delivered by the defendant, because to impose such a requirement would be "to require him to prove that he would have taken the 'very steps' that defendant's 'wrongful act . . . precluded him from taking.'" *Id.* (quoting *Kaufman v. Diversified Indus., Inc.*, 460 F.2d 1331, 1336 (2d Cir. 1972)). Delaware law holds that "the issuer-defendant should bear the risk of uncertainty in the share price because the 'defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable.'" *Duncan*, 775 A.2d at 1023 (quoting *American General*, 622 A.2d at 10). "Because it is the defendant who creates this uncertainty, 'fundamental justice requires that, as between [the plaintiff] and [the defendant], the perils of such uncertainty should

10

be laid at defendant's door.'" *American General*, 622 A.2d at 10 (quoting *Madison Fund, Inc. v. Charter Co.*, 427 F.Supp. 597 (S.D.N.Y. 1977)).

Under Delaware law, the starting point for the damages period is the date of the breach. *See, e.g., Haft*, 877 F.Supp. at 902 n.2 (D. Del. 1995) (damages calculated based on price on date of plaintiff's discovery of breach). Under the Certificate of Designation, GigaBeam was obligated to deliver shares of common stock "within five Trading Days of the date of which the Notice for the payment [of the Redemption Amount] is provided by a Holder." (Ex. A § 9(b)) Accordingly, GigaBeam was obligated to deliver shares of common stock by July 17, 2007, in response to Portside's Initial Redemption Notice, and by July 25, 2007, in response to the Amended Redemption Notice.

The next step in calculating Portside's damages is to identify the highest price at which GigaBeam shares traded within a reasonable period of time following the date of the breach. As the Court explained in *Duncan v. Theratx, Inc.*, "[t]he 'reasonable time' in this context is the 'time in which [the plaintiff] could have disposed of its shares without depressing the market had it been able to do so.'" 775 A.2d at 1023 n.9. *See also American General*, 622 A.2d at 13. In *Duncan,* the Court found an eleven-day period reasonable. 775 A.2d at 1021. In *Comrie*, the Court used a single day for the hypothetical sale because the shares would have represented less than 20% of the average daily trading volume of the issuer's stock for the week of the breach. 837 A.2d at 21 n.102.

The price to be used for the damages calculation is the highest trading price during the relevant period. *See BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 284 (Del. Ch. 2003); *Haft*, 877 F.Supp. at 902 (court calculates damages "at the highest market price within a reasonable time of plaintiff's discovery of the breach"). *BioLife Solutions* is instructive. There,

11

plaintiff was entitled to 120,022 shares, which under the pertinent agreement could be traded at a maximum of 25,000 shares per day.  To calculate damages, the Delaware Chancery Court assumed the plaintiff could have sold 25,000 shares on each of the first four trading days and 20,022 on the fifth day, and then "multiplied the high price of the shares on each of the five trading days by the number of shares presumed sold on each such date to determine the expected gross proceeds." *BioLife*, 838 A.2d at 284.

Applying the Delaware rule to the present case, GigaBeam was required to deliver 166,532 shares in response to the Initial Redemption Notice by July 17, 2007.  However, the shares that GigaBeam was obligated to deliver to Portside were not registered with the SEC and could only be sold pursuant to exemptions afforded by Rule 144.  Under Rule 144(e),[2] 17 C.F.R. § 230.144(e), a person who has held shares for more than a year (but less than two years) may sell, during any ninety-day period, the greater of "(i) 1% of the shares or other units of the class outstanding as shown by the most recent report or statement published by the issuer, or (ii) the average weekly volume of trading of such securities on all national securities exchanges . . . during the four calendar weeks preceding the filing of the notice required by paragraph (h) . . . ."

As of July 17, 2007, Portside was entitled to sell an aggregate of 65,490 shares, representing one percent of the outstanding shares set forth in GigaBeam's Form 10-Q filed with the SEC in May 2007.  By Monday, July 23, 2007, Portside was entitled to sell an aggregate of 67,348 shares, representing the average weekly trading volume over the prior four weeks. Accordingly, while Portside should have received 166,532 shares on July 17, 2007, it could only sell up to an aggregate of 65,490 of those shares during that week and up to an aggregate of 67,348 of those shares (including any shares sold during the prior week) during the week of July

---

[2] There is no dispute that Portside qualified for the exemption afforded by Rule 144(e); its Preferred Stock was convertible, without further consideration, into common stock so that the underlying common shares had the same holding period as the Preferred Stock.  17 C.F.R. § 230.144(d)(3)(ii).

554238-4

23, 2007. The highest trading price of GigaBeam common stock between July 17 and July 23, 2007, was $7.31, reached on July 23, 2007. Thus, Portside is entitled to damages based on a hypothetical sale of 67,348 shares at $7.31 per share, for a total of $492,313.88.

A review of GigaBeam's trading history over these five trading days confirms that such an award is consistent with Delaware law. Between July 17 and July 20, 2007, GigaBeam's shares were thinly traded; indeed, the aggregate volume over these four days was only 88,500, not much more than the maximum number of shares that Portside could then sell. (Ex. J) On Friday, July 20, 2007, GigaBeam announced a major sale order. (Ex. K) The following trading day, July 23, 2007, its trading volume and share price increased substantially, with 8,402,200 shares trading. (Ex. J) A reasonable period for Portside to sell 67,348 shares would therefore run from July 17 to July 23, 2007, with the highest price ($7.31) reached on July 23, 2007.

After giving effect to the sale of shares on July 23, 2007, Portside would have been left with 99,184 shares. GigaBeam was obligated to deliver an additional 55,411 shares in response to the Amended Redemption Notice, bringing the total shares that Portside should have held to 154,595 as of July 25, 2007. During the week of July 23, 2007, trading in GigaBeam shares increased dramatically, with more than 17 million shares changing hands. (Ex. J) However, Portside would not have been able to sell any more shares until July 30, 2007, when this increase in volume would have been factored into the volume limitation under Rule 144(e) to allow Portside to sell all of its remaining shares of GigaBeam common stock.

By July 30, 2007, GigaBeam trading volume had decreased from the prior week, with only 403,700 shares changing hands; the highest trading price was $5.99. Between July 30 and August 3, 2007, approximately 1.5 million shares changed hands, with another large volume trading day on August 6, 2007, when GigaBeam's stock price reached a high of $6.04. The

13

reasonable period for disposal of GigaBeam common stock based on the number of shares held

by Portside and GigaBeam's trading volume began on July 30, 2007 and continued for several

days thereafter.  The precise period is not relevant because the highest trading price was achieved

on July 30, 2007 ($5.99 per share).  (Ex. J)  This result is particularly reasonable since higher

trading prices were achieved on August 6, 2007, when 1.79 million shares changed hands, and

on August 9, 2007, when more than one million shares traded.  (Ex. J)

Accordingly, under Delaware law, a $5.99 per share price should be applied to the

remaining 154,595 shares, for a total of $926,024.05, bringing Portside's total monetary damages

for breach of contract to $1,418,337.93.

D.    Portside is Also Entitled to Equitable Relief

In its Second Claim for Relief, Portside seeks specific performance.  For the reasons set

forth above, Portside is entitled to summary judgment on this count, directing GigaBeam to

deliver 222,043 shares of common stock to Portside.

Portside is entitled to the equitable relief of specific performance because GigaBeam may

not be able to satisfy a money damages judgment.  To obtain an order of specific performance, a

party must show (1) there is a valid contract; (2) the moving party has substantially performed

under the contract and is willing and able to perform all remaining obligations; (3) the opposing

party is able to perform its obligations; and (4) the moving party has no adequate remedy at law.

See Laurus Master Fund, Ltd. v. Versacom Int'l, Inc., No. 02 Civ. 5340, 2003 WL 21219791, at

*3 (S.D.N.Y. May 21, 2003).  Where a defendant issuer may not be able to satisfy a money

judgment against it for its failure to deliver shares, the plaintiff lacks an adequate remedy at law,

and the court may order the defendant to deliver the shares themselves. See Alpha Capital

Aktiengesellshaft v. Advanced Viral Research Corp., No. 02 CV 10237(GBD), 2003 WL 328302,

at *4-*5 (S.D.N.Y Feb. 11, 2003) (ordering defendant issuer to deliver shares where defendant's

14

554238-4

lack of assets made it likely that it would be unable to satisfy damages judgment). *See also Connecticut Nat'l Bank v. Trans World Airlines, Inc.*, 762 F.Supp. 76, 80-81 (S.D.N.Y. 1991) (granting specific performance where defendant unlikely to be able to satisfy money judgment). GigaBeam's weakened financial condition is beyond dispute.

According to GigaBeam's Form 10-QSB filed in August 2007, it had only $53,084 in cash at June 30, 2007.  (Ex. L)  This represented a substantial decline from its position at December 31, 2006, when it had $653,734 in cash.  Between July 1, 2006 and June 30, 2007, GigaBeam's cash holdings declined from $2,067,406 to $53,084.  Its financial statements also indicate that there exists "substantial doubt about the Company's ability to continue as a going concern."  (Ex. L at p. 13 (internal))

Under the election of remedies doctrine, a party that has been awarded both equitable and legal relief is entitled to choose between the forms of relief at the time judgment is entered.  *See TVT Records v. Island Def Jam Music Group*, 250 F.Supp.2d 341, 348 (S.D.N.Y. 2003) ("[T]o the extent necessary, an election between equitable and monetary relief can occur after a verdict is rendered."); *Vista Co. v. Columbia Pictures Indus., Inc.*, 725 F.Supp. 1286, 1295 (S.D.N.Y. 1989) ("election may take place after trial"); *Croce v. Kurnit*, 565 F.Supp. 884, 894 (S.D.N.Y. 1982) (election between action in equity or action at law for damages "is to be made after trial"); *Omega Executive Services., Inc. v. Grant*, No. 78 Civ. 4616, 1980 WL 1432 (S.D.N.Y. Aug. 22, 1980) (plaintiff not required to elect before trial between action for damages and for specific performance of delivery of stock).  Accordingly, any award of summary judgment should permit Portside to elect which of the two counts should become the final relief.

E.    Portside is Entitled to Additional Relief

Under either of the above remedies, Portside is entitled to relief in three other respects: (i) partial liquidated damages under the Registration Rights Agreement for the period from April

15

25, 2007 through July 10, 2007, plus interest thereon; (ii) interest on the "Triggering Redemption Amount" from July 25, 2007 at eighteen percent; and (iii) attorneys' fees.

Liquidated Damages.  The Registration Rights Agreement provided Portside with the right to receive partial liquidated damages upon the occurrence of an "Event," which is defined, in relevant part, as follows:

> (iv) **after the Effectiveness Date, a Registration Statement ceases for any reason to remain continuously effective as to all Registrable Securities for which it is required to be effective,** or the Holders are not permitted to utilize the Prospectus therein to resell such Registrable Securities for 20 consecutive calendar days but not more than an aggregate of 30 calendar days during any 12-month period (which need not be consecutive Trading Days) (any such failure or breach being referred to as an "Event," and for purposes of . . . clause (iv) the date on which such 20 or 30 calendar day period, as applicable, is exceeded being referred to as "Event Date") . . . .

(Ex. B § 2(b))  (emphasis added)  The Registration Rights Agreement further provides that "on each such Event Date and on each monthly anniversary of each such Event Date (if the applicable Event shall not have been cured by such date) until the applicable Event is cured, the Company shall pay to each Holder an amount in cash, as partial liquidated damages and not as a penalty, equal to 2% of the aggregate purchase price paid by such Holder . . . ."  (Ex. B § 2(b))  Thus, on May 15, 2007, Portside became entitled to a payment equal to 2% of the purchase price for its Preferred Stock ($342,000) and it was owed an additional payment for the same amount on June 15, 2007, for a total of $13,680.  Under the Registration Rights Agreement, these amounts are earning interest at 18% per annum until paid in full because GigaBeam failed to

16

make payment within seven days.  (Ex. B § 2(v))  Accordingly, Portside is entitled to $13,680, with interest at 18% from June 7, 2007 until paid in full.[3]

Interest on the Triggering Redemption Amount.  The Certificate of Designation also provides that the Triggering Redemption Amount earns interest at the rate of 18% unless paid within five trading days after demand.  Here, Portside is entitled to interest on $451,486.26, commencing July 25, 2007, at the rate of 18% per annum until paid in full.

Attorneys' Fees.  In Section 13(d), the Certificate of Designation provides: "if either party shall commence an action or proceeding to enforce any provisions of this Certificate of Designation, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding."  Accordingly, the Court should award Portside its attorneys' fees in pursuing this action, severing the award of attorneys' fees for further proceedings.

## Conclusion

Based on the foregoing, plaintiff Portside respectfully requests that the Court grant its motion for summary judgment.

---

[3] Interest is due on the first payment beginning May 22 and on the second payment beginning June 22; for ease of calculation, interest on both payments should run from June 7, 2007, the midpoint between these dates.  N.Y. C.P.L.R. § 5001(b).

554238-4

Dated: New York, New York
       October 5, 2007

                             OLSHAN GRUNDMAN FROME
                             ROSENZWEIG & WOLOSKY LLP

By: _____
          Thomas J. Fleming (TF 4423)
          Joshua S. Androphy (JA 1481)
          *Attorneys for Plaintiff*
          Park Avenue Tower
          65 East 55th Street
          New York, New York 10022
          (212) 451-2300

18