UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PORTSIDE GROWTH AND OPPORTUNITY
FUND,

                        Plaintiff,           Case No. 07 CIV 6990 (NRB)

   -against-

GIGABEAM CORPORATION,             **DECLARATION IN OPPOSITION
                                                           TO PLAINTIFF'S MOTION FOR
                      Defendant.       SUMMARY JUDGMENT**
-------------------------------------------------------------X

      AMY TROMBLY, swears under penalties of perjury, pursuant to 28 U.S.C. § 1746, that:

      1.     I am the founding member of Trombly Business Law ("TBL"), located at 1320 Centre Street, Suite 202, Newton, Massachusetts 02459. TBL is corporate counsel to Defendant Gigabeam Corporation ("Gigabeam"). My statements herein are based on my review of the underlying agreements in this matter, including all documents submitted to the Court by Plaintiff Portside Growth and Opportunity Fund ("Portside"), as well as my understanding of the issues raised therein as my firm's status as "counsel to the Company" as that term is used in Section 2 of the Registration Rights Agreement (the "Registration Rights Agreement" is annexed to the Declaration of Jeffrey C. Smith, sworn to on October 5, 2007 ("Decl. Smith"), as Exhibit B). As shown below, issues of fact exist making summary judgment inappropriate at this time.

      2.     After graduating law school, I was an attorney at the Securities and Exchange Commission (the "SEC") in Washington, DC, from 1994 to 1998. I then worked as an in-house corporate attorney for an unrelated company for one year and subsequently worked as a corporate attorney for Mintz Levin Cohn Ferris Glovsky Popeo, P.C. located in Boston, Massachusetts. In 2002, I formed my own law firm, TBL.

**The Underlying Stockholder Agreement Documents are Intended to Protect Investors and Portside has Always been "Protected", Accordingly No Breach Occurred as to Portside**

3.  Portside admits it has no basis to claim an alleged breach. Portside's Memorandum of Law (at page 10), admits that it's cited case law all start with the presumption that "a plaintiff [must be] wrongfully deprived of the ability to sell securities he was contractually entitled to sell… [in order to claim a material breach]." Here, regardless of whether the Registration Statement was effective or whether it lapsed, Portside was at all relevant times able to sell its Registrable Securities. Thus, the entire underlying premise of Portside's argument is severely flawed.

4.  As pointed out by Portside, there are essentially two operative agreements: (i) the Registration Rights Agreement; and (ii) the Certificate of Designation of Preferences, Rights and Limitations of Series B Convertible Preferred Stock (the "Certificate of Designation" is annexed to the Decl. Smith as Exhibit A). Portside claims that a "Triggering Event" occurred under Section 9(a)(ii) of the Certificate of Designation, so I will focus my analysis on the language related thereto.

5.  Section 9(a)(ii) of the Certificate of Designation states that a Triggering Event occurs:

> [I]f, during the Effectiveness Period, the effectiveness of the Conversion Shares Registration Statement lapses for any reason for more than an aggregate of 60 calendar days (which need not be consecutive days) during any 12 month period, or the Holder shall not be permitted to resell Registrable Securities under the Conversion Shares Registration Statement for more than an aggregate of 60 calendar days (which need not be consecutive days) during any 12 month period.

Decl. Smith, Exh. A, Section 9 (a)(ii).

6.  Portside apparently reads that statement to literally mean that there are two separate and distinct ways (under that one subsection) for a Triggering Event to occur --

2

regardless of the fact that the second statement is clearly meant to explain the purpose of the first. That interpretation, however, would render the intent of parties' absolutely meaningless and grant Portside a windfall where one was not intended to be granted. The correct way to read that subsection -- according to the intent of the parties when it was written -- was that the second statement (following the ", or") merely explains the first (i.e. the effect of a "lapse" would be the inability to resell). Thus, the intent of the parties was that a Triggering Event will occur under this subsection if the stockholder is unable to resell their Registrable Securities. Said differently, Portside is taking the word "or" to mean "one *or* the other" when the intent of that "or" was simply to convey an explanation of the first statement. That is precisely why the terms of the two statements are exactly the same: "60 calendar dates (which need not be consecutive) during any 12 month period)." The point is that if Portside was able resell their Registrable Securities (whether by way of the Registration Statement or by some other means), there is no Triggering Event under that subsection. Indeed, this point is made even further in the Registration Rights Agreement.

7. Under the Registration Rights Agreement, the operative related language is contained in Section 2(a):

> ... the Company shall ... use its best efforts to keep such Registration Statement continuously effective under the Securities Act until all Registrable Securities covered by such Registration Statement have been sold or may be sold without volume restrictions pursuant to Rule 144(k) as determined by the counsel to the Company pursuant to a written opinion letter to such effect...

Decl. Smith, Exh. B, Section 2.

8. The connection between keeping the Registration Statement "continuously effective" or permitting the investors to sell the Registrable Securities in some other manner is to be determined by my law firm, as Gigabeam's corporate counsel. That said, Portside never

3

requested a determination by me or anyone at my firm, but had Portside done so, we would have informed Portside that the Registration Statement being effect was totally irrelevant as to Portside's rights, as Portside met the requirements to sell its Registrable Securities without volume restrictions since November 7, 2006. If Portside was in fact interested in selling its Registrable Securities, Portside was obligated to seek an opinion letter from my firm, which we would have provided for a total of $350. This point is important so I will re-state it in greater detail: if Portside converted all of its Series B Preferred Stock, the amount of underlying common stock, 56,066 shares, would be below the volume restriction set forth in Rule 144 and thus Portside would be able to sell all 56,066 of its shares without restriction. This would achieve the same result as Portside selling under Rule 144(k) (or for that matter, through the Registration Statement), so my firm would have been comfortable stating the same in a Rule 144 opinion letter. Of course, Portside never contacted me or requested to sell its shares.

9.      Because Portside, at least in my review of their arguments, is trying to confuse the Court (rather then helping the Court understand the intent of the relevant documents), I believe it is imperative for the Court to understand that the underlying agreements were meant to protect *all* stockholders (they were not specifically drafted for any one investor, such as Portside). As such, the documents were drafted specifically to protect the stockholders that had the most restrictions placed on their resell of Registrable Securities (i.e. those stockholders that are subject to the confines of the Rule 144 volume limitations) -- with the view that if the agreements protect the stockholders with most heightened restrictions, by its very nature, the documents also protect stockholders with lesser restrictions to resell (such as Portside). Despite Portside's incorrect interpretation, the contracts were not drafted to give stockholders such as Portside a windfall solely because certain investors with heightened restrictions (not Portside) may have been

harmed by Gigabeam's alleged failure to allow those other investors to resell their Registrable Securities. It seems to me that if Portside was never harmed by a Registration Statement not being continuously effective (as is most certainly the case), Portside should not be able to collect a windfall of damages as if it had been harmed by such Registration Statement lapse.

<u>Portside's Damages, if any, Should be Capped at $350</u>

10.     Had Portside wanted to sell its Registrable Securities, Portside was obligated under the Registration Rights Agreement to request that my firm draft an opinion letter (which we would have done pursuant to Rule 144). My firm would have charged its standard fee of ***three-hundred and fifty dollars*** ($350) for that letter, which is the same fee my firm charges for 144(k) legal opinions as well, and Portside would then have been able to resell all of its Registrable Securities regardless of the status of the Registration Statement. Other shareholders have, in fact, paid the $350 fee, obtained a legal opinion and sold their shares pursuant to Rule 144 during the time period in question. Any damages that were caused to Portside (above $350) were due solely to Portside's own bad-faith conduct and its own failure to request an opinion letter from my firm.

DATED:     November 2, 2007

_____
Amy Trombly, Esq.

## AFFIRMATION OF SERVICE

STATE OF NEW YORK       )
                        )ss.:
COUNTY OF NEW YORK      )

JORDAN M. KAM, ESQ., affirms under penalties of perjury:

1. I am over the age of 21 years, am not a party to this action, and reside in New York, New York.

2. On November 5, 2007, I caused the foregoing to be served by Federal Express overnight mail, on counsel for Plaintiff, at the address listed below:

   Thomas J. Fleming, Esq.
   Olshan Grundman Frome Rosenzweig & Wolosky LLP
   Park Avenue Tower
   65 East 55th Street
   New York, New York 10022

   _____
   Jordan M. Kam