UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
PORTSIDE GROWTH AND OPPORTUNITY FUND,   :
                                        :
                        Plaintiff,           :
                                        :   No. 07 Civ. 6990 (NRB)
    v.                                    :
                                        :
GIGABEAM CORPORATION,                   :
                                        :
                        Defendant.          :
------------------------------------------------------------------------x


### GIGABEAM'S MEMORANDUM IN RESPONSE TO PLAINTIFF'S REQUEST FOR DAMAGES, SPECIFIC PERFORMANCE, LIQUIDATED DAMAGES AND ATTORNEY'S FEES

 

Robert I. Bodian (RB 2627)
Jason D. Padgett (JP 7751)
MINTZ, LEVIN, COHN, FERRIS,
 GLOVSKY AND POPEO, P.C.
The Chrysler Center
666 Third Avenue, 25th Floor
New York, New York  10017
(212) 935-3000

*Attorneys for Gigabeam Corp.*

June 9, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 2

ARGUMENT ....................................................................................................................... 3

I.      PORTSIDE IS NOT ENTITLED TO BE AWARDED CONTRACT DAMAGES BASED ON "HIGHEST INTERMEDIATE VALUE" ............................... 4

          A.    Portside Does Not Apply the Correct Standard for Calculation of Damages for Breach of Contract ........................................ 4

          B.    The Authority Portside Relies on Is Not Applicable Here, Because Portside Held Freely Alienable Shares of Gigabeam Common Stock ........................................................................ 6

          C.    The Certificate of Designation Provides Bargained for Protection to Plaintiff for the Delayed Tender of the Redemption Shares ........................................................................................ 9

II.     SPECIFIC PERFORMANCE IS AN APPROPRIATE REMEDY ................................ 10

III.    PORTSIDE IS NOT ENTITLED TO A CASH PAYMENT FOR PARTIAL LIQUIDATED DAMAGES AND HAS MISCALCULATED THE TRIGGERING REDEMPTION AMOUNT .................................................................. 11

CONCLUSION ................................................................................................................... 13

TABLE OF AUTHORITIES

Page(s)

*Cases*

*Am. General Corp.* v. *Continental Airlines Corp.*,
   622 A.2d 1 (Del. Ch. 1992) ................................................................................. 4, 5, 6, 7-8

*BioLife Solutions, Inc.* v. *Endocare, Inc.*,
   838 A.2d 268 (Del. Ch. 2003) .................................................................................................6

*Comrie* v. *Enterasys Networks, Inc.*,
   837 A.2d 1 (Del. Ch. 2003) .....................................................................................................6

*Duncan* v. *TheraTx, Inc.*,
   775 A.2d 1019 (Del. 2001) ........................................................................................ 6-7, 8, 9

*Haft* v. *Dart Group Corp.*,
   877 F. Supp. 896 (D. Del. 1995) .............................................................................................6

*J.J. White, Inc.* v. *Metropolitan Merchandise Mart, Inc.*,
   107 A.2d 892 (Del. Super. 1954) ........................................................................................4, 5

*Kaufman* v. *Diversified Industries, Inc.*,
   460 F.2d 1331 (2d Cir. 1972) .............................................................................................5-6, 9

*LaPoint* v. *AmerisourceBergen Corp.*,
   No. Civ.A. 327-CC, 2007 WL 2565709 (Del. Ch. Sept. 4, 2007) ...........................................5

*Statutes and Regulations*

17 C.F.R. § 230.144 (2007) .................................................................................................2, 4

Defendant Gigabeam Corporation ("Gigabeam") submits this memorandum of law, and the accompanying Declaration of Jason D. Padgett, executed June 9, 2008, in response to the Court's request that Gigabeam respond to the arguments of plaintiff Portside Growth and Opportunity Fund ("Portside") concerning damages, specific performance, liquidated damages, and attorney's fees.

## PRELIMINARY STATEMENT

It is a well established principle that compensation for one who is injured by a breach of contract should place the injured party in the same position as it would have been in if the contract had been performed. Here, that would mean that Portside would receive the shares of common stock to which this Court ruled it was entitled. But Portside seeks much more in damages, hoping to generate from defendant's breach a huge windfall (far beyond even the resources of defendant). Most notably, Portside requests that this Court estimate its damages by assuming that Portside would have sold the Gigabeam common stock it requested in its redemption election at the stock's highest trading price in over a year. Portside claims that it is entitled to this remedy because what it would have done with its shares is uncertain due to defendant's breach, and therefore defendant needs to bear the brunt of that uncertainty. But, as a matter of fact, Portside possessed thousands of shares of Gigabeam common stock that it could have sold when the stock reached its high. But Portside chose not to sell those shares, and still holds them today. Put another way, Portside did <u>not</u> sell the shares it could have sold during the period of the breach, but asks this Court to infer that Portside *would* have sold the shares Portside did not have. The result of Portside's hypothetical gymnastics, unsurprisingly, would be to award Portside with a windfall. The Court should not indulge Portside's improper attempt at using hindsight to secure enormous damages that far exceed its expected value at the time of breach.

**BACKGROUND**

In June 2006, Portside purchased 342 shares of Gigabeam Series B Preferred Stock from Omicron Master Trust.  As a holder of record, Portside received dividends from the Gigabeam shares.  On January 4, 2007, Gigabeam authorized the issuance of 1,611 shares of common stock to Portside as a dividend payment.  (Padgett Decl. Ex. A.)  Portside received those shares on January 5, 2007, and sold those shares on January 26, 2007.  (Padgett Decl. Ex. B.)  On April 4, 2007, Portside agreed to receive common stock and stock warrants in lieu of a cash dividend payment for its April dividend.  (Padgett Decl. Ex. C.)  On May 1, 2007, Gigabeam authorized the issuance of 2,366 shares of common stock to Portside as a dividend.  (Padgett Decl. Ex. D.)  Portside received those shares on May 10, 2007.  (Padgett Decl. Ex. B.)  According to records obtained from the company's transfer agent, Portside has not sold these shares.  (Padgett Decl. Ex. B.)  This is true despite the fact that these shares are salable under Rule 144 because they are stock dividends.

By letter dated April 25, 2007, Gigabeam informed holders of its Series B Preferred Stock that the company had suspended the effectiveness of its registration statement for Series B Preferred Stock.[1]  (Smith Decl. Ex. G.)  On July 10, 2007, Portside demanded that Gigabeam redeem its Series B Preferred Stock for 166,532 shares of common stock pursuant to Section 9(b) of the Certificate of Designation.  (Smith Decl. Ex. H.)  On July 18, 2007, Portside amended its redemption notice to demand 222,043 shares of common stock.  (Smith Decl. Ex. I.)  By requesting redemption pursuant to Section 9(b), Portside was demanding many more shares than it would normally be entitled to under the conversion rights of the Series B Preferred Stock.  On

---

[1]  Gigabeam does not dispute that the first day the Registration Statement was ineffective was April 25, 2007.  Because a "Triggering Event" means when the Registration Statement "lapses for any reason for more than an aggregate of 60 calendar days during any 12 month period," the Triggering Event occurred on June 25, 2007.  (Smith Decl. Ex. A § 9(a)(ii).)

August 3, 2007, Portside filed the complaint in this action, alleging that Gigabeam breached its obligations under the Registration Rights Agreement and the Certificate of Designation for the Series B Preferred Stock by not tendering shares in response to Portside's redemption demand. Portside sought damages and specific performance in its complaint.

On or about October 5, 2007, Portside moved this Court for summary judgment. In its summary judgment papers, Portside argued that Gigabeam had breached its duties under the Registration Rights Agreement and the Certificate of Designation by not tendering the redemption shares. In its memorandum and order dated May 19, 2008, this Court granted summary judgment in favor of Portside, and directed Gigabeam to submit a response to Portside's damages calculations.

## **ARGUMENT**

Gigabeam addresses Portside's calculation of damages in three respects. First, Gigabeam opposes the application of Portside's proposed standard of calculating damages for breach of contract. The highest intermediate value measure of damages, advanced by Portside, is a surrogate for actual damages in certain circumstances when there is uncertainty as to the selling price (and date) due to the unavailability of the shares that in theory would have been sold. But that hypothetical measure of damages is not available where, as here, plaintiff held freely alienable securities which it could have, but did not, sell. Second, with respect to Portside's request for specific performance, Gigabeam concedes that specific performance is an appropriate remedy in this case. Third, Portside is not entitled to a cash payment for the partial liquidated damages that it claims. The Certificate of Designation clearly provides that any outstanding liquidated damages should be included in the calculation of the number of redemption shares to be tendered after an election upon a Triggering Event.

## I.

## PORTSIDE IS NOT ENTITLED TO BE AWARDED
## CONTRACT DAMAGES BASED ON "HIGHEST INTERMEDIATE VALUE"

Portside argues that the proper measure of damages in this case is a conversion measure of damages, specifically "the highest intermediate value of the securities between the date of the breach and a reasonable period thereafter." (Pl. Br. at 10.) But the facts of this case preclude application of this relief. From May 10, 2007 and continuing through today, Portside has held thousands of shares of Gigabeam common stock, all of which it was free to sell.[2] Portside cannot now, in hindsight, claim that it would have sold the shares due to it at the highest price at which the shares have traded in over a year when it did not even sell a single share of the thousands it held during that period. To award Portside's requested measure of damages would violate the bedrock principle of contract law limiting a plaintiff's recovery to the loss it actually sustained as the result of a breach. This Court should award the current market value of the shares for the breach of contract claim because the evidence shows Portside would have held its shares and the contract already provides extensive remedies for any delay Portside has experienced in receiving its converted securities.

**A.   Portside Does Not Apply the Correct Standard for Calculation of Damages for Breach of Contract**

It is well established that compensation for one who is injured by a breach of contract "should be such as will place him in the same position that he would have been in if the contract had been performed." *J.J. White, Inc.* v. *Metropolitan Merchandise Mart, Inc.*, 107 A.2d 892, 894 (Del. Super. 1954); *see also Am. General Corp.* v. *Continental Airlines Corp.*, 622 A.2d 1, 8

---

[2]   The shares Portside held were paid to it on May 10, 2007 as stock dividends. (*See* Padgett Decl. Ex. B, Ex. D at 1.) Because the shares were acquired as stock dividends, they "shall be deemed to have been acquired at the same time as the securities on which the dividend . . . was paid." 17 C.F.R. § 230.144(d)(3)(i) (2007). Thus, the stock dividends could have been sold immediately upon receipt under Rule 144(e).

(Del. Ch. 1992). "The measure of damages is the loss actually sustained as a result of the breach of the contract." *J.J. White*, 107 A.2d at 894. "To be entitled to compensatory damages, plaintiffs must show that the injuries suffered are not speculative or uncertain." *LaPoint* v. *AmerisourceBergen Corp.*, No. Civ.A. 327-CC, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007). In other words, plaintiffs bear the burden of showing that the damages they seek are "provable to a reasonable certainty." *Id.*

Portside has not met this burden. Instead, Portside seeks an exclusion from this basic rule of damages, claiming that it "is not required to show that [it] would have sold the securities at the time they should have been delivered by the defendant, because to impose such a requirement would be 'to require him to prove that he would have taken the very steps that defendant's wrongful act . . . precluded him from taking.'" (Pl. Br. at 10 (citing *Am. General*, 622 A.2d at 10).) But Portside cannot rightfully take advantage of this exclusion because it held thousands of shares of Gigabeam common stock—which it never was precluded from selling—during the period when its investment decisions were supposedly unknowable. Thus, this is not a situation where Gigabeam's breach precluded Portside from exercising its investment judgment and selling the shares it held. Portside's decision to hold its shares demonstrates not only what it would have done, but what it actually *did* do when faced with the circumstances that Portside claims this court must "approximate" by calculating the value of the shares owed to it at the highest prices the stock has traded at in over a year.

The Second Circuit's decision in *Kaufman* v. *Diversified Industries, Inc.*, 460 F.2d 1331 (2d Cir. 1972), provides the appropriate damages analysis for this case. In *Kaufman*, the court considered a dispute over the delayed tender of shares pursuant to an agreement for the sale of a business. On the question of the measure of damages that plaintiff suffered as a result of the delayed tender of the shares, the court held that a conversion measure of damages did not apply

and found that no damages should have been awarded to plaintiff. *Id.* at 1336-37. The court based its decision on the fact that "[t]he record in this case does not permit an inference that Kaufman would have sold the 13,170 shares had he received them [when due]." *Id.* at 1337. In considering the record, the Second Circuit took particular notice of the fact that plaintiff "made no attempt to dispose of 8,015 Diversified shares which he already owned." *Id.* at 1337 n.8.

Portside, like the plaintiff in *Kaufman*, had in its possession thousands of shares of common stock, which it never attempted to sell. Thus, this case presents more than a lack of evidence that Portside would sell; it presents affirmative evidence that Portside would not have sold its shares—because Portside in fact could have, but did not, sell the shares of Gigabeam that it held. Accordingly, this Court, like the Second Circuit in *Kaufman*, should not apply the highest intermediate value formula. Instead, the court should apply as damages the current value of the shares owed to Portside.

**B.     The Authority Portside Relies on Is Not Applicable Here, Because Portside Held Freely Alienable Shares of Gigabeam Common Stock**

In support of its argument, Portside cites a line of cases in which the alienability of securities was restricted by defendants' breaches. *See Duncan* v. *TheraTx, Inc.*, 775 A.2d 1019 (Del. 2001); *Haft* v. *Dart Group Corp.*, 877 F. Supp. 896 (D. Del. 1995); *BioLife Solutions, Inc.* v. *Endocare, Inc.*, 838 A.2d 268 (Del. Ch. 2003); *Comrie* v. *Enterasys Networks, Inc.*, 837 A.2d 1 (Del. Ch. 2003); *Am. General*, 622 A.2d 1. Each of these cases presents an almost identical rationale for applying the highest intermediate value measure of damages. This rationale is typified by the Delaware Supreme Court's decision in *Duncan* v. *TheraTx, Inc.* 775 A.2d 1019 (Del. 2001).

In *Duncan*, the court considered what the proper measure of damages is when a defendant breaches its contractual obligation to cause a shelf registration to remain in effect,

leading to the temporary suspension of plaintiffs' ability to trade a restricted stock. 775 A.2d at 1020. The Delaware Supreme Court held that the damages should be measured "by calculating the difference between (1) the highest intermediate price during a reasonable time at the beginning of the restricted period, which functions as an estimate of the price that the stockholders would have received if they had been able to sell their shares, and (2) the average market price of the shares during a reasonable period after the restrictions were lifted." *Id.* The court stated its rationale for using the highest intermediate price for estimating the price the stockholders would have received for the shares as follows:

> The intuition behind this rule is that the issuer-defendant should bear the risk of uncertainty in the share price because the "defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable."

775 A.2d at 1023 (citing *Am. General*, 622 A.2d at 10). But this rationale is clearly inapplicable to the present case. Here, what Portside would have done with its securities is known because it possessed freely alienable shares, which it did not sell. Because there is no uncertainty as to the course of action Portside would take in this case, there is no need to use the highest intermediate value to estimate the value of Portside's redemption shares.

Portside relies on the same line of cases for the related position that it is not required to provide any evidence on whether or when it would have sold its shares. (*See* Pl. Br. at 10.) However, these cases lend Portside's argument no support. Of the cases cited by Portside, only *American General Corp.* v. *Continental Airlines Corp.*, even dealt with a plaintiff that had in its possession the securities that were the subject of the suit. 622 A.2d 1. But *American General* is factually distinguishable from this case.

In *American General*, the court considered the appropriate measure of damages for defendant's failure to provide a stock option to the plaintiff, a holder of stock warrants, in breach

-7-

of the contractual warrant rights.  The court applied a variation of the highest intermediate value as damages.  Defendant claimed that the highest intermediate value formula was not an appropriate measure of damages because the plaintiff never lost its ability to sell its warrants.  The court found that, while plaintiff "always had the legal ability to sell its warrants, defendants' breach certainly interfered with the salability of the warrants as a practical matter." *Am. General*, 622 A.2 at 9.  Thus, "[b]ecause American General's ability to sell its warrants and realize their full value was clearly undermined by defendants' breach, the issue of damage must be resolved without resort to an inquiry into plaintiff's intent." *Id.*  In this case, on the other hand, Portside held freely alienable shares of Gigabeam's common stock.  Thus, Portside's ability to sell the shares it held was not limited by Gigabeam's breach, and an inquiry into what Portside would have done with its shares is appropriate.  And, that inquiry shows that Portside did not sell the shares it held, which most assuredly does not support hypothesizing that Portside would have sold the shares it did not have.

In *Duncan*, the defendant also made the argument that it is appropriate to inquire into what a plaintiff would have done with its shares.  While the court in *Duncan* did find that such an inquiry was inappropriate in that case, its decision is inapplicable here for at least two reasons.  First, the court's statements are dicta because, as the court explicitly noted, the district court had already made a finding that the plaintiff intended to sell its shares during the period in question.  *Duncan*, 775 A.2d at 1022 n.7.  Second, the plaintiffs in that case were unable to sell their shares during the period in question, making the question of what the plaintiffs would have done with their shares "uncertain."  *See id.* at 1023.  As such, the court determined that it is the defendant who "should bear the risk of uncertainty."  *Id.*  Here, on the other hand, plaintiff held freely alienable shares which it could have sold at any time during the relevant period, making the question not what plaintiff would have done, but rather what plaintiffs *did*.

-8-

The better rule to apply in this case is that set forth by the Second Circuit in *Kaufman*, 460 F.2d 1331. As in *Kaufman*, the record in this case does not permit an inference that Portside would have sold its shares at the high prices it is claiming, because it made no attempt to dispose of the shares it already owned. *See id.* at 1337 n.8. Accordingly, this Court should not apply the highest intermediate value formula, and should, instead, award Portside the current value of the shares.

C.     **The Certificate of Designation Provides Bargained for Protection to Plaintiff for the Delayed Tender of the Redemption Shares**

As discussed above, the Court should award as damages only the current value of the common stock owed to Portside. This measure of damages avoids a windfall to Portside for its claiming, in hindsight, that it would have sold its shares at the stock's peak when it actually held the shares it had in its possession. However, it is not the case that Portside will be uncompensated for the portion of time that it spent without being able to sell its redemption shares. The contract provides for interest at a rate of 18% per annum to be paid to Portside for the amount of time that it goes without its shares. This amounts to over $85,000 of interest that is payable to Portside, pursuant to the contract.[3]

This interest provision represents the parties' attempt to place an *ex ante* measure of damages to any delay in tendering the redemption shares. The existence of this *ex ante* provision is yet another reason why Portside's proposed measure of damages is improper in this case. It is well established that "the standard remedy for breach of contract is based upon the reasonable expectation of the parties *ex ante*." *Duncan*, 775 A.2d at 1022. Where, as here, the parties have

---

[3]     This is in addition to the more than $13,000 in liquidated damages that the contract provides for because the registration statement was not in effect and the dramatic increase in the number of redemption shares Portside is due to receive because it elected to redeem upon a Triggering Event pursuant to Section 9(b).

-9-

expressed what their expectation of damages for breach would be, this Court should honor that measure.

## II.

## SPECIFIC PERFORMANCE IS AN APPROPRIATE REMEDY

Gigabeam concedes that specific performance is an appropriate remedy in this case.[4]  In fact, it is the only remedy that does not result in the destruction of Gigabeam.  Portside argues that specific performance is available when the plaintiff can show "(1) there is a valid contract; (2) the moving party has substantially performed under the contract and is willing and able to perform all remaining obligations; (3) the opposing party is able to perform its obligations; and (4) the moving party has no adequate remedy at law."  (Pl. Br. at 14.)

All four of these requirements have been met by Portside.  This Court already has found that there is a valid contract and that Portside has substantially performed under the contract.  As to the third requirement, Gigabeam is able to issue the shares necessary to perform any obligations it has under the contract.  As to the fourth requirement, Gigabeam does not dispute that where a defendant may not be able to satisfy a money judgment against it, the plaintiff lacks an adequate remedy at law.

Gigabeam concedes that it may not be able to satisfy money damages.  In Gigabeam's most recent financial statement, filed with the Securities and Exchange Commission for the quarter ending on September 30, 2007, Gigabeam disclosed that it had $6,180 in cash and equivalents compared to $6,997,102 in total current liabilities.  (Padgett Decl. Ex. E.)  Gigabeam does not dispute that its financial condition is weakened and, therefore, specific performance is

---

[4]  Portside submitted a letter to the Court, dated June 5, 2008—only two business days before Gigabeam's brief on damages was due—electing to withdraw its claim for specific performance.

an appropriate remedy in this case. Indeed, Gigabeam could not pay the money judgment sought here by Portside.

### III.

**PORTSIDE IS NOT ENTITLED TO A CASH PAYMENT
FOR PARTIAL LIQUIDATED DAMAGES AND HAS
MISCALCULATED THE TRIGGERING REDEMPTION AMOUNT**

Portside argues that the Registration Rights Agreement provides for the payment of partial liquidated damages upon the occurrence of an "Event," which includes when:

> a Registration Statement ceases for any reason to remain continuously effective for which it is required to be effective, or Holders are not permitted to utilize the Prospectus therein to resell such Registrable Securities for 20 consecutive calendar days . . . .

(Smith Decl. Ex. B § 2(b).)  Upon such an Event, and on each monthly anniversary of the Event, "the Company shall pay to each Holder an amount in cash, as partial liquidated damages and not as a penalty, equal to 2% of the aggregate purchase price paid by such Holder . . . ."  (Smith Decl. Ex. B § 2(b).)

Gigabeam concedes that partial liquidated damages are owed to Portside, but disagrees on how they are payable.  Portside claims that partial liquidated damages are payable as cash.  (Pl. Br. at 16-17.)  However, the clear intent of the Certificate of Designation is that any liquidated damages outstanding at the time a Holder elects for redemption of shares upon a Triggering Event be factored into the number of shares payable to the Holder and not paid as cash.

Section 9(b) sets forth the method of calculating the number of common shares to be redeemed upon an election by a Holder after a Triggering Event.  This formula provides that the shares the Holder would receive is equal to the "Triggering Redemption Amount divided by 75%

-11-

of the average of the 10 VWAPs immediately prior to the date of the election hereunder."[5]

(Smith Decl. Ex. A § 9(b).)

> The Triggering Redemption Amount, in turn, is defined, in relevant part, as:
>
>> the sum of (i) . . . 130% of the Stated Value . . ., (ii) all accrued but unpaid dividends thereon and (iii) *all liquidated damages* and other amounts due in respect of the Preferred Stock.

(Smith Decl. Ex. A, at 7 (emphasis added).)  Thus, the Certificate of Designation requires that the partial liquidated damages be factored into the Triggering Redemption Amount, which is used to establish the number of shares due to a redeeming Holder.  Accordingly, partial liquidated damages should not be awarded to Portside in cash.

This adjustment changes the calculation of the number of shares that Portside would receive from its redemption.  Portside's calculation for the Triggering Redemption Amount, $451,486.26, accounts for 130% of the Stated Value and the accrued but unpaid dividends.  The Court should add to this amount $13,680 for the liquidated damages and $224.39 for the interest due on the liquidated damages from June 7 until July 10, 2007.[6]  Taking the new Triggering Redemption Amount ($465,390.65) and dividing it by 75% of the average of the 10 VWAPs immediately prior to July 10, 2007 (2.033325) equals 228,882, which is the proper number of redemption shares.  Because the partial liquidated damages were factored into the number of shares redeemable, the partial liquidated damages are not separately payable in cash.

---

[5] Though Portside has not explicitly identified the number it is using for "75% of the average of the 10 VWAPs immediately prior to the date of the election," the parties appear to agree that it should be 2.033325, which is calculated from the date of Portside's first election on July 10, 2007.

[6] Because the same 18% interest rate is applicable to the Triggering Redemption Amount and the partial liquidated damages, no additional interest accrues on the partial liquidated damages after July 10, 2007 apart and separate from the interest on the Triggering Redemption Amount.

## **CONCLUSION**

For the reasons stated above, Gigabeam respectfully requests that the Court deny Portside's calculation of damages for breach of contract and instead award specific performance or the current market value of 228,882 shares of Gigabeam common stock. Gigabeam also requests that the Court deny Portside's request for partial liquidated damages.

Dated:  June 9, 2008
   New York, New York

>MINTZ LEVIN COHN FERRIS
>   GLOVSKY AND POPEO, P.C.
>
>
>By: /s/ Robert I. Bodian
>   Robert I. Bodian (RB 2627)
>   Jason D. Padgett (JP 7751)
>   666 Third Avenue, 25th Floor
>   New York, New York  10017
>   Phone: (212) 935-3000
>
>*Attorneys for Gigabeam Corp.*